**VAN BRODE MILLING CO., Inc.,**
Appellant,

v.

**COX AIR GAUGE SYSTEM, INCORPORATED,** Appellee.

No. 16168.

United States Court of Appeals
Ninth Circuit.
May 27, 1960.

Lyon & Lyon, Reginald E. Caughey, Los Angeles, Cal., Kirschstein, Kirschstein & Ottinger, New York City, for appellant.

Buchalter, Nemer, Fields & Savitch, Los Angeles, Cal., Kane, Kessler & Proujansky, Albert N. Proujansky, New York City, Edward Halle, New York City, for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

Appellant, assignee of a patent for plastic battery hold-down frames, brought this action in the court below for patent infringement and unfair competition. Appellee Cox Air Gauge System, Incorporated, a distributor of the accused frames, brought a counterclaim for declaratory judgment as to the validity of the suit patent. The district court found no infringement or unfair competition, and further found the suit patent invalid. The district court had jurisdiction over the infringement claim, 28 U.S.C. § 1338(a), the unfair competition claim, 28 U.S.C. § 1338(b), and the counterclaim for declaratory judgment, 28 U.S.C. §§ 1338(a), 2201–2202. This Court has jurisdiction on appeal. 28 U.S.C. § 1291.

### I. Facts

In 1950 the inventor, Sidney Coleman, an employee of Van Brode, conceived the idea of making automobile battery hold-down frames of a plastic material rather than of metal, from which they had been previously fabricated. The problems with metal frames were that they were subject to corrosion by the fumes and

leakage of the sulphuric acid in the battery electrolyte, and also since the metal was a good conductor of electricity the metal frames tended to encourage fires and battery failure from short-circuiting. The initial problem was finding a plastic with the necessary rigidity to contain the battery without being subject to brittleness failure.

The plastics readily available were polystyrene and polyethylene, one too brittle and the other too flexible. Coleman solved this problem by physically mixing polystyrene with a copolymer of butadiene and polystyrene having a high styrene content, in the neighborhood of seventy per cent. Facilities for performing the operation of physically mixing the polystyrene and the copolymer in a satisfactory manner were not readily available to Van Brode, and the initial commercial production using the locally mixed plastic was not entirely satisfactory due to breakage returns. Subsequently, bids were elicited from Dow and Monsanto for plastic powder of the required proportions, and this ready mixed powder was henceforth used in the frames of appellant. The Monsanto product ultimately chosen by appellant contained a modifying copolymer of approximately forty-two per cent styrene.

The frames were commercially successful. The motoring public purchased some three million of them up to the time of this suit. No automobile manufacturers use them as original equipment. They continue to use the metal frames, and all sales of the plastic frames have thus been as replacement items. The frames are sold primarily by battery outlets. When a battery is replaced it apparently is comparatively easy to convince the purchaser that he needs a new hold-down frame. It is conceded by the parties that the eventual purchaser does not discriminate between manufacturers and know the source of his new "hold-down", and that the important phase of the marketing operation is placement of the frames with jobbers and retailers.

Four months prior to the commencement of this action Kravex Manufacturing Corporation decided to enter the market for plastic hold-down frames. They were aware of the Van Brode product and patent, and instructed their supplier to avoid infringement. He agreed, but did nothing further to determine what might constitute infringement. The material chosen for the accused frames was a polystyrene modified by a copolymer of butadiene and styrene with a styrene content of between thirty-eight and forty-two per cent. (Since in the copolymerization process it is difficult to predict precisely how much of the styrene will enter the copolymer, the percentage can not be given precisely.) The accused frames are the same color as the frames of appellant, red, and the shape is very similar, as it needs must be to serve the function of holding down batteries. The accused frames are packed in red and yellow boxes, and the frames of appellant are packaged in red and white boxes.

Appellant's assignor had some difficulty obtaining the patent from the Patent Office. The original application was refused by the examiner and the Board of Appeals on the ground that in the light of the prior art the claims were too broad and the disclosure insufficient. The original claim specified only "polystyrene modified by Darex copolymer no. 3" (the original powder which did not prove to be satisfactory) without giving the proportions or mixing instructions. The claims were amended to specify a material consisting of "polystyrene the mechanical and physical properties of which have been modified by the addition of a Buna S with a high styrene content * * *". Upon re-submission the claims were accepted and the patent issued.

## II. Literal Infringement

The trial judge found that the accused frame did not infringe the patented frame. One simple fact issue is decisive on this point. That is the standard for determining whether a given copolymer has a high or low styrene content. The suit patent specifies a "high" styrene content. The accused frames contain a

copolymer containing thirty-eight to forty-two per cent styrene.

The evidence adduced on trial by appellant consists of the testimony of an expert witness in the plastics field that the standard Buna S is twenty-five per cent styrene, and that this marks the dividing line between high and low styrene content. During World War II Buna S was highly regarded as a synthetic rubber, and was rigidly controlled by the government, all production having been required to conform to the government standards. The "standard" government synthetic rubber was made by using a mixture of seventy-five per cent butadiene and twenty-five per cent styrene, but since some of the styrene was lost in the copolymerization the final content was about twenty-two per cent styrene. None of the government standards called for a higher percentage than fifty per cent styrene. It is perhaps significant that these government standards relied upon by appellant's expert were considered by him to be rubber standards, and he admitted that there were no standards in the plastics industry. Appellant's expert further testified that since the government standard was twenty-five per cent, this provided the accepted standard for all Buna S copolymers.

Appellee produced an expert who testified that the dividing line should be drawn at a fifty per cent mixture. He based his opinion on common sense semantics, and also believed that this line would provide a more useful breaking point when dealing with plastics and the specific properties of Buna S. As the percentage of styrene is increased the copolymer becomes more akin to a plastic and less like a rubber. The point at which the copolymer ceases to be useful as a rubber is about fifty per cent styrene. Beyond that point the brittleness and tensile strength of the plastic control the flexibility of the rubber. Appellee's expert also used the government standards to bolster his conclusions, pointing out that none of the government *rubbers* exceeded fifty per cent styrene.

Further emphasis is laid by appellee on the testimony of the inventor himself, who testified that as far as he knew a high styrene copolymer was one with more than fifty per cent styrene. However, the inventor was not a scientist nor a chemist. He discovered the original Darex modifying plastic in a cigarette case and ordered the compounding of the plastic originally used in total ignorance of the chemical composition of the ingredients.

Evidence was presented by appellee to show that copolymers existed with up to ninety-five per cent styrene. The trial judge found that the term "high styrene content" as used in the claims and specifications of the suit patent meant a copolymer having more than fifty per cent styrene. Since the accused frame contained only thirty-eight to forty-two per cent styrene he found that the accused frame was not made according to the teaching of the patent, the accused frame having a low styrene content.

Appellant contends that this is an erroneous finding of fact by the trial court. But the evidence would indicate that this is far from a clearly erroneous finding. The best that can be said for the evidence from appellant's point of view is that it shows that there may well be no standard for this plastic, and that the term "high styrene content" may be meaningless. And if the term is meaningless, it would be equally difficult to find an infringement.

### III. Infringement by Equivalents

Appellant claims that even if the trial court was correct in its choice of standard to be applied to the term "high styrene content" and its finding of no literal infringement, that the accused frame infringes the suit patent under the doctrine of equivalents. Appellant states that it is entitled to protection from frames made of any plastic which embodies the physical properties claimed for the patented product in the suit patent, *i. e.,* strength, corrosion and heat resistance, and non-conductance. In effect

they claim protection against all plastics which are suitable for the purpose of hold-down frames.

However, the Patent Office history of the suit patent leads us to a different conclusion. The original application made broad claims· defined by physical properties rather than chemical composition:

"The thermoplastic material of which said frame is formed having good electrical insulating properties, resisting changes in physical properties at different temperatures and possessing strength and toughness to withstand pressure to which the frame is subjected in its function to hold the battery on its support but having enough flexibility to prevent breakage of the battery top against which said diagonal clamping members bear in the holding down operation."

When the first application was refused by the Patent Office the claim was narrowed to limit the claim to "a plastic material * * * comprising polystyrene the mechanical and physical properties of which have been modified by the addition of a Buna S with a high styrene content * * *." This modification was made pursuant to a rejection of the initial application based in part on prior art. The Board of Appeals, after describing certain other patents, stated:

"Leuvelink clearly discloses the use of a hold-down device made of plastic material and there would certainly be no invention in making the hold-down clamp of Mabey out of plastic material, if desired. The subject matter in the last ten lines of claim 1, as presented in the brief, merely sets forth the desired properties of the plastic and in no way recites the composition of the plastic. These statements are purely functional and may not be relied on for patentability unless there is a positive setting forth of the structure itself or the composition which is responsible for such properties."

Since the accused device falls within an area which was excluded from the claims in order to meet objections of the Patent Office, "file wrapper estoppel" prevents the appellant from claiming infringement by equivalents. Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736; Westinghouse Electric & Mfg. Co. v. Condit Electrical Mfg. Co., 2 Cir., 1911, 194 F. 427, 430.

IV.  Validity of the Suit
Patent

■■■  It is clear that the issuance of a patent is presumptive evidence of its validity. E. g., Massa v. Jiffy Products Co., 9 Cir., 1957, 240 F.2d 702. The findings of the trial judge on the nature of the prior art, and what the patentee did to improve upon it, are entitled to great weight. Ultimately, however, the question whether the patentee has conceived an article worthy of protection under the patent laws is one of law for this Court, Rohr Aircraft Corp. v. Rubber Teck, Inc., 9 Cir., 1959, 266 F.2d 613, 618; Cee-Bee Chemical Co. v. Delco Chemicals, 9 Cir., 1958, 263 F.2d 150, 153; Bergman v. Aluminum Lock Shingle Corp. of America, 9 Cir., 1958, 251 F.2d 801, and on review of the record and findings here presented, we must agree with the conclusions of the trail judge.

Appellant emphasizes that it does not claim either a mechanical patent or a chemical patent exclusively. It does not pretend to have invented the hold-down frame for automobile batteries. Nor does it claim to have invented the particular kind of high impact plastic which the suit patent specifies. What it claims for the invention is the combination of two elements, the substitution of plastic for metal, to provide a safer, more useable frame than was previously in existence.

Appellant points to various factors in an effort to sustain the validity of the patent.

*The patent satisfied a long-felt need.* It is true that a witness for appellant testified that there existed a long-felt

need. There were extensive sales of the product. But there was also a lack of acceptance of the plastic frames as original equipment on new cars. Before the plastic frames were placed on the market very few metal replacement frames were sold, an indication that replacement of frames was not necessary.

*The frames were a commercial success.* Appellant sold three million frames. Appellee points out that all but one per cent of the frames sold were manufactured with a "low styrene" copolymer, and thus not within the claims of the patent. This may prove the disclosure inadequate, but it does not detract from the commercial success of the frames.

*The invention has utility.* Once the breakage problem was solved by use of the pre-mixed plastic powder the "invention" undoubtedly had some utility.

*The disclosure was sufficient.* The patent was held to be invalid by the trial court for lack of sufficient disclosure. The missing factor was the proportion of modifying polymer to polystyrene, which nowhere appears in the patent. (At the trial it was claimed that the actual percentages used varied between twelve and twenty.) The patent also made no attempt to describe the proportion of styrene in the modifier, unless the attachment of the Darex brochure to the file wrapper could be so construed. But the Darex material is very dissimilar to the material used in the accused frames as well as that used in ninety-nine per cent of the frames made under the suit patent.

■ It is apparent that full disclosure is important to the patent law to protect persons from uncertainty as to their rights and to insure ultimate dedication to the public. General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 369, 58 S.Ct. 899, 82 L.Ed. 1402. Appellant cited cases which indicate that only a reasonable certainty is necessary in the disclosure. Minerals Separation, Ltd., v. Hyde, 1916, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286; Application of Hudson, Cust. & Pat.App.1953, 205 F.2d 174; Research Products Co. v. Tretolite Co., 9 Cir., 1939, 106 F.2d 530. But the uncertainty allowable by the rule of these cases is limited to the inherent uncertainty in the patented device, and the uncertainty here present goes far beyond those limits. It would further appear that any element of inventiveness would be dependent upon more precise disclosure than was present in the suit patent.

■ Appellant claims error in the introduction and evaluation of the prior art. The trial court held there was a lack of inventiveness. It relied on certain prior patents as well as the general state of knowledge in the plastics industry of the properties of high impact plastics. One of the patents considered, Ditz, was not issued until after the filing date of the suit patent. Appellant claims that this patent was considered for the purposes of prior art, basing its claim on the statements which were made at the time of its introduction. The Ditz patent describes a method of using a very similar plastic to that in the suit patent for making battery casings. It is conceded that the Ditz patent was not admissible as prior art, but it is argued by appellee that the patent was not admitted on such broad grounds, but rather on more restricted grounds to show the "status of the art." Title 35, section 102(e) of the United States Code provides that if the invention is described by a patent filed prior to the suit patent, it anticipates the suit patent. Appellant claims that since the precise invention, a plastic battery hold-down frame, was not described in Ditz, the section is inapposite. It is not clear for what purpose the trial judge used the Ditz patent. The colloquy at admission is not clear, and the opinion of the trial judge is not specific as to the consideration given Ditz. But if we assume the admission was error, it is difficult to see that the admission of the one patent was prejudicial error.

Two patents were considered by the court in which metal frames to hold down batteries were claimed. Also a patent, Leuvelink, which covered plastic or molded rubber clamps for electron tubes which had a high resistance to electrical

current was in evidence. Leuvelink preceded the suit patent by ten years, and could be said to show the way to using plastic clamps where nonconductance is desirable. Further evidence received consisted of numerous technical articles describing the advance made in the high impact plastic field.

■ In summation, the basic weakness of the suit patent is that it fails to sufficiently describe what it purports to be in terms of its chemical composition, relying rather on a description of the properties desired from the mixture instead of the ingredients of the mixture which will give satisfactory performance. This is particularly important in view of the fact that no claim is made to invention of the hold-down frame itself, nor of the high-impact plastic which is generally specified in the claims. Battery hold-down frames had been used in cars for many years, and the plastics industry was in a very advanced state at the time of the alleged invention, so it is incumbent on the patentee to describe with specificity in order to qualify for inventiveness. General Electric Co. v. Wabash Appliance Corp., supra.

### V. Unfair Competition

Appellant attacks the disposition of its unfair competition claim. Its case is based primarily on the similarity between the patented and the accused frames. Both are colored red, and both are similarly shaped. It would be difficult to attach much importance to the similarity in color. Evidence in the record shows that red is the most used color for plastic automobile accessories generally, for the reason that this color is thought to be most popular with the purchasing public. And in this situation it is useful to distinguish the plastic product from the metal competitor. This similarity in shape is easily explained. Batteries come in standard sizes and thus so must the frames. The frames must in general approximate the dimensions of the metal frames they replace, so the permanent fixtures in the automobile can be utilized

The ultimate consumers admittedly take little notice of which brand of hold-down they purchase. The retailers and jobbers are the individuals who must be misled by the similarity, and they of course would be more difficult to mislead than the customer. As the trial judge summarized the matter:

> "There is nothing in the record to indicate that, in the trade, the color red on the frame, or the colors red and white on the boxes, have become associated, in the minds of either prospective customers or suppliers with the plaintiff's product, or that either have acquired a secondary meaning which identifies their source and sponsorship with the plaintiff. So the case is lacking absolutely in the essentials which go to constitute unfair competition."

Appellant cites the case of Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190. The most striking dissimilarity between that case and this is that there the trial judge found unfair competition and the court of appeals merely affirmed his decision. Furthermore, in Ross-Whitney, the similarity in shape between the tablets of the defendant and those of the plaintiff had no relation to the function of the tablets, but was merely to help identify the product's source. That is not the case here.

### VI. Conclusion

■ This appeal appears basically to be a number of disagreements with the trial judge on the findings of fact. We find that the results reached by the trial judge on the infringement and unfair competition issues are clearly correct rather than being clearly erroneous.

The patent validity question is more in balance. There is considerable authority to the effect that substitution of a new material for an old one can be a patentable novelty if the new combination is a great improvement over the former. E. g., Smith v. Goodyear Dental Vulcanite Co., 1877, 93 U.S. 486, 23 L.Ed. 952.

But we feel that the new substance was not described with sufficient specificity to qualify for patentability. A "high" styrene content does not describe nor properly claim the invention.

The judgment below is affirmed.