**AMP INCORPORATED, Plaintiff,**

v.

**BURNDY CORPORATION, Artcraft Electric Supply Co., Defendants.**

**Civ. A. No. 1967.**

United States District Court
D. Delaware.
March 4, 1963.

**4**

Thomas S. Lodge, Connolly, Bove & Lodge, Wilmington, Del., William C. Conner, and Truman S. Safford, Curtis, Morris & Safford, New York City, for plaintiff.

Richard F. Corroon, Berl, Potter & Anderson, Wilmington, Del., Floyd H. Crews, Morris Relson, and William F. Dudine, Jr., Darby & Darby, Daniel Gersen, and George M. Szabad, Blum, Jolles, Haimoff, Szabad & Gersen, New York City, and Ernest Fanwick, Norwalk, Conn., for defendants.

LEAHY, Senior District Judge.

## I. PRE-LITIGATION BACKGROUND

Plaintiff AMP, Incorporated, sued Burndy Corporation for infringement. Defendant's answer denies infringement, charges the patent in suit is invalid, and seeks a declaratory judgment that the patent is invalid and not infringed. The patent, No. Re. 23,688 (7/21/52), was granted as a re-issue of No. 2,410,321 (10/29/46) on application of William S. Watts filed December 14, 1943. He assigned to plaintiff AMP, here.

The patent is for an electrical connector having a tubular metal ferrule adapted to receive an electrical conductor—i. e., the end portion of an insulated wire from which the insulation has been stripped to bare the inner conductor. Surrounding the metal ferrule is a tube of insulating plastic which is capable of transmitting from a crimping die to the ferrule and conductor, sufficient force to produce plastic or irrecoverable deformation of the ferrule and conductor without cutting or excessive extrusion of the plastic, so, after crimping, the plastic sleeve furnishes an insulating sheath for the ferrule to prevent an electrical short circuit.[1]

About 30 years ago the common method of making electrical connections was by soldering.[2] This method had certain disadvantages. For example, a defective soldered joint is hard to tell from a good one, and this makes visual inspection of soldered electrical short circuits practically impossible.[3] By the late 1930's, industry gave up the soldered connections and began to use the crimp-type connectors of the general type here to be considered.[4] In the crimp-type connectors, the crimping pressure compresses the ferrule and conductor strands to remove as much as possible the void space between the strands of the conductor and

---

1. PX 1; Watts, R. 249–256.
2. Whitley, R. 82; Bosworth, R. 148.
3. Whitley, R. 86, 87; Bosworth, R. 155; Meyer, R. 435, 436.
4. Bosworth, R. 148.

between the conductor and the ferrule to form a solid metalic cross-section. By reason of the compression, the cross-sectional area of both the ferrule and the strands are reduced. This deformation of the ferrule and conductor strands is required so as to flatten out their surface irregularities and bring them into surface-to-surface contact with one another.[5] When crimp-type connectors started to be used, the standard method was the "post insulation" method. This called for a length of insulating tubing (first varnished cambric and later soft plastic) which was slipped over the wire before it was inserted into the connector ferrule. After the connector was crimped onto the wire, the insulating sleeve was pushed over the ferrule of the connector and tied in place with a piece of string.[6] This was the best way known prior to Watts, and was the method in military and commercial aircraft manufacturing before World War II and for several years thereafter.[7] It would appear the patentee, Watts, had conception and had reduced his invention to practice about March 10, 1942.[8]

Watts' first pre-insulated connector was made with vinylidene chloride tubing ("Saran"). Other types of plastic tubing were tried, among which was a slightly plasticized copolymer of vinyl chloride and vinyl acetate ("Irv-O-Lite").[9] The latter had certain advantages over Saran, and is used as the illustrative material in the specifications of the patent.[10] Irv-O-Lite, in slightly plasticized form, was used in plaintiff AMP's first commercial connectors and is used today.[11] It was sold in a soft, plasticized form, and it was also commercially available in the normally rigid, flexible, slightly plasticized form as stated in the patent.[12] In the early 1940's reduction of the percentage of plasticizer in the copolymers of vinyl chloride and vinyl acetate was well known —either by baking or by the use of solvents.[13] Watts' pre-insulated connectors had a number of advantages over the former post-insulation method. Among these: 1. saving in time and installation costs;[14] 2. inventory reduction of the number of parts required to be stocked;[15] 3. reduction of corrosion;[16] 4. elimination of the hazard of displacement of the insulation from the conductor;[17] 5. saving in space and weight;[18] 6. greater support for the wire and reduction of wire breakage;[19] 7. color coating of the plastic insulation and the crimping tool to guarantee use of the proper tool for the size of the connector to be crimped;[20] 8. utilization of automatic machines into which the connectors are fed in strips whereby the individual connectors are severed and applied to the wire with resultant less manufacturing costs.[21]

Plaintiff AMP started manufacturing and sale of pre-insulated connectors under Watts' invention sometime during the latter part of 1943.[22] AMP's connectors caught the attention of the industry. On a cost analysis basis, aircraft manufacturers found the new connectors re-

5. Whitley, R. 75–78, 92, 93.

6. PX 8; Watts, R. 195, 196; Bosworth, R. 150, 151; Tweddell, R. 213, 214; Druliner, R. 224–228; Troeger, R. 290–292.

7. Ibid.

8. PX 3; Watts, R. 195–202; Sowa Dep., DX 148, pp. 37–39.

9. Watts, R. 199–203; Sowa Dep., DX 148, pp. 37–41.

10. PX 1, Col. 3, lines 34–37.

11. Watts, R. 205, 206; Paules, R. 3001, 3006–8.

12. Holcombe, R. 578, 596, 598; PX 43.

13. Mark, R. 2252–2255.

14. Watts, R. 254.

15. Ibid. 255.

16. Troeger, R. 282–286.

17. Watts, R. 255.

18. Ibid.

19. Ibid. 255–256.

20. Ibid 252–254.

21. PX 16, 17; Watts, R. 256–260; PX 20, p. 9.

22. PX 9; Watts, R. 386; Bosworth, R. 157.

sulted in a saving.[23] They reduced the safety hazard of aircraft in flight. The past had shown failure of a single connector had caused the loss of planes and passengers.[24] Gaining wide acceptance in the industry, the new connectors displaced from commercial use the old post-insulation method.[25] Since 1945 to time of trial, plaintiff AMP has sold about 3 billion of these connectors with a total dollar volume of around $82,500,000.[26]

While plaintiff AMP started commercial manufacturing of the pre-insulated connectors in the latter part of 1943,[27] defendant Burndy did not enter the field until mid-1944 and did not offer a complete line of pre-insulated connectors until 1948.[28] Prior to this, e. g., from 1924–1936, Burndy made bolt-type connectors for use in electrical power distribution.[29] In 1936, it began to make uninsulated crimp-type connectors.[30] During World War II, it supplied the aircraft industry with post-insulated connectors.[31] Disadvantages were observed and Burndy sought an acceptable substitute.[32] It first learned of the AMP pre-insulated connectors in 1944, obtained samples, examined and tested them.[33] On June 6, 1944, its chief engineer, Julian Rogoff [now president of defendant Burndy], made an application for a patent on pre-insulated connectors.[34] During prosecution, the Patent Office Examiner cited original Watts No. 2,410,321.[35] Rogoff filed no affidavit attesting to his conception prior to Watts' filing date of December 14, 1943; neither did he copy Watts' claims (under Patent Office Rule 205) in order to start an interference to determine priority of invention between himself and Watts. On the contrary, Rogoff confined his application to a single claim which recited that the plastic insulating material had the property of retaining the shape of the indenting die and was successful in showing that Watts patent did not disclose this feature.[36] On October 20, 1947, Rogoff's application was granted and there issued Burndy's present No. 2,429,585. Eight days later, October 28, 1947, AMP filed application for reissue of the Watts patent.[37] The aplication contained, in addition to the four original claims, a fifth claim which was a copy of the single claim of the Rogoff patent.[38] An interference was declared between Watts and Rogoff with respect to the subject matter of Rogoff's single claim.[39] The Board of Interference Examiners ruled that Watts did not disclose the characteristic of Rogoff's connector "retaining the shape" of the indenting die.[40] Following the interference proceeding, the Patent Office allowed to Watts Claims 5, 6 and 7 of his Reissue Patent.[41] After issuance of the Watts Reissue Patent, Rogoff filed an application for reissue of his No. 2,429,585, copying Claims 5, 6 and 7 of the Watts Reissue Patent.[42] Rogoff's application for reissue was rejected by the Patent Office Examiner and was affirmed by the Patent Office Board of Appeals,[43] and

23. PX 14; Druliner, R. 222–229; PX 13; Bosworth, R. 151, 152; Tweddell, R. 212–217; PX 18; Troeger, R. 282–296.

24. Bosworth, R. 153, 155, 161–163, 189; Troeger, R. 282–289, 294, 295.

25. Druliner, R. 228, 229; Tweddell, R. 217; Troeger, R. 294, 295.

26. PX 24; Holcombe, R. 405.

27. See n. 22, supra.

28. Rogoff, R. 1582.

29. DX 114; Rogoff, R. 1634, 1635, 1655, 1656.

30. Rogoff, R. 1635.

31. PX 85; DX 112; Rogoff, R. 1687, 1688, 1740, 1741.

32. Rogoff, R. 1664–1716; DX 89–94.

33. Rogoff, R. 1717, 1718.

34. PX 31, p. 5, Claim 1; DX 114; Rogoff, R. 1720, 1806, 1807.

35. PX 31, p. 20.

36. PX 31, pp. 9, 21.

37. Holcombe, R. 461–465.

38. DX 7, p. 8.

39. DX 7, p. 83.

40. DX 156, pp. 14–16; PX 2, Col. 1, line 53, to Col. 2, line 13.

41. PX 1.

42. DX 158, pp. 18, 19.

43. PX 122.

by the Court of Customs and Patent Appeals.[44]

## II. VALIDITY

██ 1. I do not think the various prior patents or publications cited by defendant constitute a *full* anticipation of Watts' invention within the meaning of 35 U.S.C. § 103. That the invention was not obvious is shown by the fact industry in general was not satisfied with the old "post-insulation" method for a number of years. There was an unsatisfied need and there were specific unsuccessful attempts to satisfy it. While the patented invention has enjoyed a strong degree of commercial success, this alone is not the test if the patent is otherwise weak.[45] But, in this case it has been a factor taken into consideration because value of the invention has been shown.

2. As to prior art, Smith No. 2,173,-668 is the closest cited by defendant, because it is the only reference which discloses the use of a copper ferrule with an insulating sleeve.[46] Smith was considered by the Patent Office during the prosecution of the original Watts patent.[47] But then, after amendments, Watts was granted his patent when he finally distinguished from Smith.

Grypma No. 2,276,511 discloses a device which is not in itself an electrical connector; it is in fact intended to support and insulate a splice made by joining two wires one to another.[48] Heidebrecht No. 2,229,849 is for a device which is not an electrical connector; it is a post-insulating tube that is wrapped around a splice after it has been completed by twisting two wires together.[49] Patnode No. 2,085,995 relates to a wire insulated by several layers of enamel.[50] Pfeffer No. 2,122,537 does not cover electrical connectors, but discloses a lid for a can.[51]

3. While cited prior art is not sufficient to throw a shadow on validity of Watts, it nevertheless contains sufficient teachings which were available to defendant Burndy to make its own devices without becoming an infringer of Watts. Watts, as will be shown in the discussion of infringement, infra, does not have the broad patent grant he thinks he has. The only feature of novelty in his allowed claims is in the phrase: "said tube having a resistance to cold plastic flow not significantly less than that of the metal of the ferrule." This is what Watts had distinguishing him from Smith. It has been called the "RCPF limitation". Burndy has used nothing from the Watts patent. Palpably Watts cannot be heard that his patent covers all plastics in the whole field of copolymers in the construction of electrical connectors.

4. The testimony in this case covers 3212 pages, there were several hundred exhibits, plaintiff's brief and proposed findings came to 180 pages, defendant's to 347 pages. As to the proposed findings, plaintiff filed 111, defendant 157, etc.[52] The trial took two months. There were many prongs to the defense. I have, here, limited my discussion to the basic issues of infringement and validity; otherwise the discussion would take on Gargantuan dimensions. I have considered the following defenses: 1. Watts deceived the Patent Office in getting his original patent; 2. his patent is invalid for vagueness and functionality; 3. all claims are invalid for public use more than one year before disclosure; 4. the reissue patent is invalid as to Claims 1 to 4 because these claims were abandoned by the reissue oath;

---

44. 261 F.2d 601, 46 CCPA 733.

45. See, Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 3 Cir., 311 F.2d 367.

46. DX 113.

47. PX 25, p. 12.

48. DX 112, Tab 4.

49. DX 113, Tab 5; Rogoff, R. 1750.

50. DX 113, Tab 10; Mark, R. 2382.

51. DX 113, Tab 9; Rogoff, R. 1760.

52. What I have done here, in making my findings under FR 52, is to rely on the master or critical facts. The proposed findings suggested by both parties deal, in the main, with a multitude of irrelevancies.

5. Claims 5, 6 and 7 are invalid because they are mis-descriptive, etc.; and 6. these claims are invalid because they are for an invention different from that of the original. There was evidence directed at all these issues, but it was insufficient to persuade me; it had no preponderance; it called for interpretation; there were only a few live witnesses on these issues; and, most of it was, at bottom, argumentative in nature. An appellate review may detect its importance; I cannot. In spite of these manifold arguments, urged by defendant Burndy, I think plaintiff AMP has a valid patent; but, it is neither as basic, nor as broad, as urged in this litigation.

## III. INFRINGEMENT

5. Claim 1 of the Watts reissue patent is typical; it reads as follows:

"1. An electrical connector of the type intended to be crimped onto a wire and including a soft metal ferrule and a normally rigid tube of tough and stiffly flexible insulating plastic tightly embracing said ferrule and covering the outer surface thereof, said tube having a resistance to cold plastic flow not significantly less than that of the metal of said ferrule, whereby said tube can transmit sufficient crimping pressure to the ferrule from a crimping tool to crimp the ferrule against a conductor by plastic flow in the metal thereof without cracking the tube or otherwise interfering with its mechanical and electrical effectiveness."

The non-infringement defenses presented here are that the claims do not read on Burndy; and Burndy uses only prior teachings. These defenses involve the issues as to what is within the scope of the patented claims, what are the nature and clarity of the disclosure, and what was disclaimed during the Patent

Office prosecution, if the doctrine of file wrapper estoppel is to be applied.

■ 5. The doctrine of file wrapper estoppel teaches an applicant for a patent whose claims are rejected and who later amends his claim, either by adding limitations or by cancelling the claims and inserting other claims that are more limited, is thereafter estopped to assert any interpretation of his restricted claims that does not give more to the added limitations. Added limitations are strictly construed against the patentee and are regarded as disclaimers of everything else in the claims. For example, the patentee cannot, after the issue of his patent, broaden his claim by dropping the element which he was compelled to include in order to secure his patent. Smith v. Magic City Kennel Club, 282 U.S. 784, 789–790, 51 S.Ct. 291, 75 L.Ed. 707; Schriber-Schroth v. Cleveland Trust Co., 311 U.S. 211, 217–218, 61 S.Ct. 235, 85 L.Ed. 132. In short, the inventor may not have recourse to recapture claims which he surrendered by amendment. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736; Carter Products v. Colegate-Palmolive Co., D.C.Md., 164 F.Supp. 503, 4 Cir., aff'd 269 F.2d 299; cert. den. 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59. The doctrine of file wrapper estoppel has been applied in Delaware. Rohm & Haas Co. v. Permuttit Co., D.C.Del., 130 F.Supp. 260.[53] Under this doctrine, the Watts patent (if it be assumed valid) must be interpreted to accord to the recovery limitation so as to distinguish it from Smith. If this be so, then Burndy does not infringe. Burndy's insulation is a non-recovery type.

7. This is the crux: Watts disclosed and claimed a plastic which would recover to the "original size and form."[54] He was his own handicapper in the rapid race of the use of plastics. Burndy, as the science of the physical properties of

53. The doctrine was recently applied in an interesting case involving plastics. Van Brode Milling Co. v. Cox Air Gauge System, Inc., 9 Cir., 279 F.2d 313. For a general review of the doctrine, see Lewis

v. Avco Manufacturing Corp., 7 Cir., 228 F.2d 919.

54. Col. 3, line 22; Claim 2; Mark, R. 1885–6; PX 11–21.

these materials enfolded, used plastic sleeves of KEL-F and nylon on its connectors. The former is essentially like nylon in its properties.[55] Nylon is a non-recovery plastic;[56] it retains permanently the shape of a crimp,[57] which is a direct opposite of the Watts disclosure. On heating, it does not recover.[58] This is the direct opposite of the AMP vinyl.[59] AMP's vinyl chloride-vinyl acetate copolymers are essentially amorphous.[60] Nylon is principally crystalline.[61] Irv-O-Lite is rubber-like.[62] Nylon has no rubbery behavior.[63]

8. These, as the evidence so clearly demonstrates, are two different classes of plastics, being at opposite poles, in any spectrum of consideration, in their characteristics. For example, one interesting characteristic of the two classes illustrates a critical difference: If a strand of Irv-O-Lite and a strand of nylon are stretched, the behavior of the two are different. In the case of the former, it will have an elongation of between 50% and several hundred percent depending upon the composition of the polymer and the amount of plasticizer in the strand.[64] Upon removal of the force, it will contract until it recovers its original size and shape.[65] In the case of nylon, a small pull will not cause any significant elongation. For a larger pull, the strand will elongate up to about 400% and then reach a new state in which it supports the pull.[66] Nylon becomes stronger per unit area of cross-section (i. e., will hold more pounds per square inch) as it stretches and becomes thinner. Upon removal of the load, the filament contracts only a few percent. The largest part of the elongation is permanent.[67] The process by which the original nylon filament is brought into this state of irrecoverable deformation is known as "cold drawing."[68]

Again, under compression, as in crimping, Irv-O-Lite assumes a set formation which it recovers after removal of compression.[69] The recovery may be accelerated by heating.[70] While nylon, under compression, as in crimping, assumes a permanent set from which it has no tendency to recover.[71] And heating has no effect, short of melting.[72] Irv-O-Lite, during crimping, if it should be subjected to excessive stresses so as to produce cutting, upon removal of the stress, the cuts will slowly be closed by the gradual recovery of the material surrounding the cuts.[73] Nylon, under the same circumstances, upon removal of the stress, the cracks will not heal, but will remain as they formed.[74] There was ample illustration at the trial that there was, therefore, a fundamental difference between the complete recovery of Watts and the non-recovery of Burndy.

9. Moreover, Burndy does not infringe because it uses nylon—which is possibly as far as Burndy could go in commercial good-faith in avoiding use of anything disclosed by Watts and still use an independent plastic. A look at Smith and Grypma shows they used plastic rubber prior to Watts; and plastics were used for electrical insulation in many environments before Watts. Nylon was available to Watts. He, instead, named opposite characteristics;

55. R. 2107.

56. Mark, R. 1853–56; Orowan, R. 844.

57. Orowan, R. 827–8.

58. Mark, R. 1855.

59. Orowan, R. 830–2; Paules, R. 3003–4; DX 13.

60. Orowan, R. 706.

61. Orowan, R. 1036–7.

62. Orowan, R. 846.

63. Mark, R. 1852.

64. Orowan, R. 844–8.

65. Orowan, ibid.

66. Mark, R. 1853–5; DX 122, 123; Orowan, R. 844.

67. Mark, R. 1853.

68. Mark, R. 1853–54.

69. R. 847.

70. R. 848.

71. Mark, R. 1853–56.

72. R. 1855.

73. Watts, R. 369.

74. R. 2107.

he may not now try to stretch his "Irv-O-Lite" to cover them.

10. In short, nylon does not have the basic characteristics of Irv-O-Lite, which was specified in the one vitalizing phrase of Watts' patent: "resistance to cold plastic flow." In sum, Watts' claim cannot be read on Burndy because, as stated, Burndy has no interest in "resistance to cold plastic flow"; Burndy's insulating sleeves are not "tightly embracing said ferrule"; and other claimed limitations are missing. I accept the RCPF limitation as construed by Burndy's expert, Dr. Hermann Mark.[75] His eminence in the theoretical and factual field of plastics was demonstrated at trial.[76] He explained to me the basis of his definition of RCPF;[77] he found no definition in the patent itself, nor in the file history.[78] I, too, was unable to find one. Flow, he said, is a process leading to deformation under the influence of external force, the extent of flow is measured by the deformation. However, "resistance to cold plastic flow" cannot be interpreted since there is no generally accepted method of measuring it in the literature. In contrast with his approach, plaintiff AMP's expert, Dr. Igor Orowan, whose eminence I well recognize, made several alternative suggestions.[79] His final suggestion, nevertheless, yielded the strange result that test data are unnecessary.[80] By contrast, under Dr. Mark's approach, not only a scientific but a legal consistency is found, e. g., Irv-O-Lite is within the scope of the Watts patent, whereas Spee-Dee rubber may be construed to be outside the pat-

ent, since it is in the prior art. And, as discussed infra, Burndy nylon and KEL-F are even farther from the patent claim. The examples are these: Irv-O-Lite has a permanent set of 15% while that of dead soft copper is 36%.[81] The RCPF of Irv-O-Lite is not less than that of rubber and Watts' patent covers Irv-O-Lite. AMP's own test showed that Spee-Dee rubber has a permanent set of three times that of copper.[82] Its RCPF is one-third that of copper. AMP's tests show that nylon has a permanent set which is seven times that of copper.[83] Its RCPF is one-seventh that of copper. AMP's tests show that KEL-F has a permanent set 5.4 times that of copper.[84] Its RCPF is less than one-fifth that of copper. From this evidence it would appear, therefore, that Spee-Dee rubber has an RCPF significantly less (i. e., *not* "not significantly less") than that of the ferrule. Clearly nylon and KEL-F are still less and thus would appear to be complete non-infringements.

11. In addition, Burndy's sleeves are not "tightly embracing said ferrule." The Watts patent[85] says that the sleeve "tightly engages" the ferrule. This is the basis for "tightly embracing" in Claim 1.[86] The patent teaches that this may be by a press fit[87] or by stretching and shrinking.[88] This was Dr. Sowa's idea; hence, the only "tightly embracing" which was part of Watts' invention was the press fit.[89] "Tightly embracing" is not a minor limitation. The reason Saran was unusable was that the sleeves could not be kept in place.[90] Here is a critical fact of observation—Burndy does

75. Dr. Mark's qualifications have been recognized as "admittedly one thoroughly familiar and skilled in the art of dealing with rubber and resins; United States Rubber Co. v. Marzall, D.C.D.C., 91 F. Supp. 1, 2; and one of the world's authorities in the field of polymer chemistry, La Maur, Inc. v. L. S. Donaldson Co., D.C.Minn., 190 F.Supp. 771, 774."

76. R. 741, 755, 1831–34, 1838–9, 2035–36; DX 120.

77. R. 2038–47.

78. R. 2038–40; PX 25.

79. R. 2049–56; 2073–78.

80. PF Q 45–46; Mark, R. 2078–9.

81. DX 38, Test 9.

82. DX 133, R. 2082–87.

83. DX 133, R. 2088.

84. DX 133, R. 2089–90.

85. Col. 3, line 16.

86. Watts, R. 356–7.

87. Line 18.

88. Lines 19–21.

89. R. 3560–7.

90. Watts, R. 205–6.

not use a press fit or adhesive;[91] in certain connectors the ends are flared by belling to keep the nylon sleeve from sliding off.[92] [Belling is old and was used by Grypma[93] and is conceded not to be "tightly embracing".[94] In other connectors, a mechanical interlock is used.[95] ]

12. AMP uses stretching, followed by baking, to shrink the sleeve on the ferrule. This keeps the seam formed by edges of the ferrule sealed, keeps the sleeve on the ferrule, and keeps it from snapping open during crimping.[96] A look at Burndy shows the ferrules are seamless or brazed[97] and do not need or obtain the first and third of these advantages.[98] In short, Burndy sleeves are kept on the ferrule by different means, i. e., belling or mechanical interference or interlocks.[99] Such a mechanical means for holding the sleeve on the ferrule is not "tightly embacing".[100] At the trial, an attempt was made to show that some Burndy sleeves were tight.[101] The sleeves had dried out and shrunk by allowing the moisture they contained to evaporate.[102] In commercial practice, however, the convincing evidence shows the Burndy sleeves are kept moisturized until used by the customer.[103]

I have finished with Claim 1; but, in detail, Claim 2 is also not infringed. Burndy's nylon tubes do not have "plastic memory"; and it does not tend "gradually to recover its original form after severe deformation";[104] in fact, they do not recover after crimping.[105] As Burndy does not use adhesive between the plastic tube and the insulation of wire,[106] plaintiff AMP concedes non-infringement here.[107]

Claim 4 should also be considered, although ignored by plaintiff, and I think it is not infringed. Burndy's SEALINK connectors do not have a "thin metal sleeve" which "surrounds" its plastic tubes.[108] In these connectors, Burndy uses two narrow copper collars on the outside of the nylon tube. They are not over the bare wires and there is no metal ferrule underneath them.[109] The ferrule is not crimped through them. They are only used to provide a seal to keep out moisture.[110]

Claims 5 and 6 are not infringed because Burndy's nylon and KEL-F do not "substantially" retain the "shape of the recess." These two materials take a permanent set and retain the indent forever. Claim 7 is not infringed because Burndy's materials do not have a "tendency to return, at least to some extent."

13. This is the finding of no infringement: Burndy uses only the prior art teachings of Smith, Grypma, Heidebrecht, and the Bakelite Review Article that teaches the vinyl plastics, particularly vinyl chloride-vinyl acetate, are a substitute for rubber for insulating coverings for wires and cables; the Douglas article in Industrial and Engineering Chemistry teaches that these two copolymers are better than rubber for wire coating and "controlled hardness may be secured by adjusting the concentration of the plasticizer"; likewise Pfeffer and Patnode teach that various other plastics have the hardness to allow crimping of a

91. Rogoff, R. 1620–22.

92. R. 1620–21.

93. Grypma, R. 1078.

94. Watts, R. 358.

95. Rogoff, R. 1620–26; DX 11, 12, 115, 116.

96. Holcombe, R. 491–8.

97. Fanwick, R. 1390; Rogoff, R. 1591–92.

98. Holcombe, R. 495, 47–8.

99. R. 1620–4.

100. Mark, R. 2105; Rogoff, R. 1620–21; Holcombe, R. 591–4.

101. R. 3156–9.

102. R. 3160–2.

103. Fanwick, R. 3162–3.

104. Mark, R. 2106–7.

105. Orowan, R. 2770–3.

106. Rogoff, R. 1620.

107. R. 2103.

108. R. 2103.

109. Mark, R. 2107–09.

110. Ibid.

metal through them; Miller, Schatzel, Bureau of Standards, and Blades, all teach a knowledge of the vinyl copolymer and its characteristics; and, the prior art, in fact, teaches to seek plastics as substitutes for rubber and other insulation. Watts by the monopoly of his patent-grant cannot encompass the physical qualities of all plastics. He has a grant of patent novelty—but, a limited one. He has limited his own monopoly.

14. I conclude:

1. Defendant Burndy is not an infringer.

2. Plaintiff's patent, without determining its breadth or scope, is valid.

3. Both the complaint and defendant's counter claim should be dismissed.

The order of dismissal should provide that each party should bear its own costs and no counsel fees will be awarded.