AMP INCORPORATED, (Appellant in No. 14435)

v.

BURNDY CORPORATION, and Artcraft Electric Supply Co. (Appellants in No. 14436).

Nos. 14485, 14486.

United States Court of Appeals Third Circuit.

Argued March 9, 1964.

Decided May 18, 1964.

Rehearing Denied June 16, 1964.

---

William C. Conner, New York City (Virgil E. Woodcock, Woodcock, Phelan & Washburn, Philadelphia, Pa., Truman S. Safford, Curtis, Morris & Safford, New York City, William J. Keating, AMP Incorporated, Harrisburg, Pa., Thomas S. Lodge, Connolly, Bove & Lodge, Wilmington, Del., on the brief), for plaintiff-appellant.

Floyd H. Crews, New York City (Darby & Darby, Morris Relson, William F. Dudine, Jr., New York City, Blum, Jolles, Haimoff, Szabad & Gersen, Daniel Gersen, George M. Szabad, New York City, Ernest Fanwick, Norwalk, Conn., on the brief), for defendants-appellees and cross-appellants.

Before BIGGS, Chief Judge, and HASTIE and SMITH, Circuit Judges.

HASTIE, Circuit Judge.

This is a patent infringement suit, with a counterclaim asking that the court declare the plaintiff's patent invalid. AMP Incorporated, the plaintiff below, owns patent No. Re. 23,688 granted July 21, 1953 as a re-issue of an original patent No. 2,410,321, issued October 29, 1946 on the application of William S. Watts, the plaintiff's employee. The devices here accused of infringing the Watts patent were manufactured and marketed by the defendant Burndy Corp. The defendant Artcraft Electric Supply Co. is a dealer who has sold the accused devices.

The district court, sitting without a jury, found that the Watts patent was valid, but that the Burndy devices did not infringe it and, therefore, entered judgment denying relief on both claim and counterclaim. 215 F.Supp. 3. Both the plaintiff and the defendants have appealed.

The patent in suit is for a pre-insulated electrical connector, a mechanical device for joining stripped end portions of two insulated wires so as to close the circuit effectively and provide a continuous insulated conductor. The Watts patent discloses a tubular metal ferrule within a closely fitting insulating rubbery plastic sleeve. The stripped ends of the wires to be connected are inserted in the ends of the hollow ferrule. External pressure is then applied, usually with a crimping die, to and through the plastic sleeve with sufficient force to compress and flatten the metal ferrule and the enclosed stripped wire ends into extensive lasting surface-to-surface contact.

Watts was not the first inventor in the field of pre-insulated electric connectors. The concept of a pre-insulated soft metal tube through which inserted wire ends could be effectively connected by crimping was not original with him. Indeed, the Patent Office rejected his original patent application for his device, filed December 14, 1943, as both indefinite and "unpatentable over the Smith patent".

The Smith patent, No. 2,173,668, issued September 19, 1939, disclosed a pre-insulated electrical connector consisting of a "ductile metallic tubing", a surrounding layer of "insulating material such as rubber", and an outer "protective sheath of a flexible and pliable character, preferably formed of woven rubberized thread or cord. * * * " Wire ends inserted into this device were connected by crimping accomplished through external pressure. The original Watts application claimed "an electrical conductor which comprises a soft metal ferrule adapted to be permanently crimped onto a wire, a normally rigid tube of tough, stiffly flexible plastic tightly embracing said ferrule; the thickness and toughness of the plastic being such as to transmit to the metal, in a narrow area adjacent a fold formed by flattening of the ferrule, sufficient pressure to coin the metal of the ferrule". It will be observed that in this original statement Watts was claiming in general terms a device which, as described, disclosed nothing new except the substitution of "tough, stiffly flexible plastic" for Smith's "insulating material such as rubber". The hollow metal connecting tube, the insulating sleeve and the crimping process all were old and all were present in Smith.

Acceding to the Patent Office rejection, Watts withdrew his original claims and amended his application, adding in each claim a new statement that his plastic sleeve had "a resistance to cold plastic flow not significantly less than that of the metal of said ferrule". In the explanatory remarks accompanying and supporting this amended application, Watts stressed this recital as to the resistance of his insulating sleeve to cold plastic flow as his inventive discovery beyond the disclosures of the prior art and beyond the claims of his disapproved original application. On this showing the claims were approved and the Watts patent issued.

■ Much of the controversy in this case concerns the meaning of the phrase "resistance to cold plastic flow". However, at this point it will suffice to say that the Patent Office found in this stated property of the Watts insulating material, meaningful specificity and an inventive differentiation from the prior art. Certainly nothing else appears or was claimed which significantly differentiates the rejected and withdrawn original claims from the amended claims which became the Watts patent. Moreover, under the doctrine of file wrapper estoppel, the patentee, having acceded to the rejection of his original claims as lacking invention over Smith and having amended his claims to include relative resistance to cold plastic flow as a definitive characteristic distinguishing his device from Smith, cannot now be heard to claim patentable novelty in any other disclosure of his original patent or the re-issue based upon it. Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736; Smith v. Magic City Kennel Club, 1931, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707.

Thus, our problem is narrowed to a determination whether it can properly be held, as the Patent Office found, that the description of Watts' insulating sleeve as "a tough, stiffly flexible plastic * * * having a resistance to cold plastic flow not significantly less than that of the metal of said ferrule" was a disclosure of invention beyond the prior art.

The witnesses in this case attributed different meanings to the phrase "resistance to cold plastic flow". On behalf of the defendants it was asserted that this phrase connoted resiliency or capacity to return in degree to original form after the removal of compressing or deforming stress. AMP, however, attempted to prove that the phrase connotes resistance to breaking or cracking under stress. One witness testified that the phrase had no generally accepted meaning in science. At most then, the allegedly inventive discovery of Watts was merely that the functioning of a familiar type of electrical connector could be improved by substituting for "an insulating material such as rubber",

a plastic tough enough and resilient enough to withstand breaking, cracking and excessive permanent deformation as a result of such pressure as would be required for effective crimping. In this connection Watts set out in his specifications that he had used as an advantageous insulating material "a vinyl chloride vinyl acetate copolymer, slightly plasticized" which was then produced and commercially available under the name "Irv-O-Lite".

It is also significant that publications antedating Watts' patent application and made part of the present record had disclosed that vinyl copolymers might advantageously be substituted for rubber as insulating coverings for cables and wires. The literature stressed the toughness of these products and pointed out that flexibility and other properties could be varied by the use of plasticizers. Thus advised, Watts found one of these commercially available vinyl copolymers, Irv-O-Lite, to be an advantageous material for his insulating sleeve.

Anyone familiar with pre-insulated electrical connectors must have known that the efficient functioning of such devices required that the insulating sleeve be made of a material through which enough force could be transmitted to crimp the enclosed ferrule and wires adequately without so damaging or so greatly and permanently deforming the sleeve as to impair its effectiveness as an insulator. If a material possessed these properties in such degree and combination that it would withstand crimping better than rubber, as the publications concerning vinyl copolymers must have suggested, its substitution for rubber as the insulating material in an electrical connector would obviously be advantageous. Yet the essence of Watts' teaching, expressed in language of relative resistance to cold plastic flow, was merely that the material of the insulating sleeve should have these obviously desirable properties and that a rubbery plastic like Irv-O-Lite was such a material.

■ These considerations make this a particularly appropriate case for applying the general rule that the substitution of a superior material for an inferior one in a known device is not invention even though the new material more satisfactorily serves or performs the intended function of the old. Sinclair & Carroll Co. v. Interchemical Co., 1945, 325 U.S. 327, 65 S.Ct. 1143, 89 L. Ed. 1644; Hotchkiss v. Greenwood, 1850, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683; General Foods Corp. v. Triangle Mfg. Co., 7th Cir. 1958, 253 F.2d 227; Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 6th Cir. 1954, 210 F.2d 146. This court's discussion and application of this principle more than 20 years ago in Fowler v. Honorbilt Products, 1942, 3 Cir., 131 F.2d 153, continues to be sound and is in point here.

■ We conclude, therefore, that the original Watts patent, No. 2,410,321, was invalid for want of invention. It necessarily follows that the re-issue patent in suit is also invalid, since it cannot avoid the definitive and essential limitations upon which the claim of invention over Smith was predicated in the original patent.

This holding makes it unnecessary to consider whether the accused devices, pre-insulated connectors in which nylon sleeves were used, infringed the Watts patent.

■ Finally, we have considered the contention of appellee, Burndy Corporation, that it should be awarded attorneys' fees. We find no such unfair or unreasonably vexatious conduct by AMP in instituting or conducting this litigation as to call for this extraordinary allowance. Therefore, though the defendants below prevail on this appeal, their costs in this court shall not include any attorney's fee.

Because our conclusion that the patent in suit is invalid differs from the decree of the district court declaring the patent in suit valid but not infringed, that judgment will be vacated and the cause remanded for the entry of a judgment consistent with this opinion.