### In re OWENS–CORNING FIBERGLAS CORPORATION.

#### Appeal No. 84–1416.

United States Court of Appeals, Federal Circuit.

Oct. 8, 1985.

**1118**

Patrick P. Pacella, Owens-Corning Fiberglas Corp., Toledo, Ohio, argued for appellant; with him on brief was Mark C. Schaffer, Emch, Schaffer & Schaub Co., L.P.A., Toledo, Ohio.

Michael L. Gellner, Asst. Sol., U.S. Patent and Trademark Office, Arlington, Va., argued for appellee; with him on brief were Joseph F. Nakamura, Sol. and Jere W. Sears, Deputy Sol., Washington, D.C.

Before NEWMAN, Circuit Judge, COWEN, Senior Circuit Judge, and BISSELL, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

Owens-Corning Fiberglas Corporation (OCF) appeals from the decision of the United States Patent and Trademark Office's Trademark Trial and Appeal Board (the Board) affirming the examining attorney's denial of registration of the color "pink" as a trademark for fibrous glass residential insulation. We reverse.

## I.

Alleging use in commerce since 1956, OCF applied on January 25, 1980, application Serial No. 247,707, for registration on the Principal Register of the color "pink" as uniformly applied to OCF's fibrous glass residential insulation. The Board held that the overall color of goods is capable of functioning as a trademark, but affirmed the examiner's denial of registration on the ground that OCF had not adequately demonstrated that the color "pink" is distinctive of OCF's goods. *In re Owens-Corning Fiberglas Corp.,* 221 USPQ 1195 (TTAB 1984).

The Board's conclusion that there is no inherent bar to trademark registration of the color of goods, when the color is an overall color rather than in the form of a design, is in harmony with modern trademark theory and jurisprudence. Prior to passage of the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.* (the Lanham Act), color alone could not be registered as a trademark. In 1906 the Supreme Court wrote:

Whether mere color can constitute a valid trade-mark may admit of doubt. Doubtless it may, if it be impressed in a particular design, as a circle, square, triangle, a cross, or a star. But the authorities do not go farther than this.

*A. Leschen & Sons Rope Co. v. Broderick & Bascom Rope Co.,* 201 U.S. 166, 171, 26 S.Ct. 425, 426, 50 L.Ed. 710 (1906). The Patent Office and the courts followed this view. For example, applications were rejected to register the color violet for gasoline, *In re General Petroleum Corp. of California,* 49 F.2d 966, 9 USPQ 511 (CCPA 1931); and a blue-and-aluminum color for oil well reamers, *In re Security Engineering Co., Inc.,* 113 F.2d 494, 46 USPQ 219 (CCPA 1940).

Despite the prohibition on registration, during this early period some courts accorded owners of color marks protection against unfair competition upon a showing of secondary meaning in the mark. In *Clifton Mfg. Co. v. Crawford-Austin Mfg. Co.,* 12 S.W.2d 1098 (Tex.Civ.App.1929), for example, the defendant was enjoined from copying plaintiff's distinctive reddish-brown coloring for tents, tarpaulins, and wagon covers; and in *Yellow Cab Transit Co. v. Louisville Taxicab & Transfer Co.,* 147 F.2d 407, 64 USPQ 348 (6th Cir.1945), the color yellow for taxicab services re-

ceived protection on principles of unfair competition.

■ The principal purpose of the Lanham Act was the modernization of trademark law, to facilitate commerce and to protect the consumer. As noted by the Supreme Court in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* — U.S. —, 105 S.Ct. 658, 664, 83 L.Ed.2d 582, 224 USPQ 327, 331 (1985):

> The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the good will of his business and to protect the ability of consumers to distinguish among competing producers.

Section 45 of the Act defines "trademark" to include "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." This was a departure from the past, as prior statutes only permitted registration of "technical" common law trademarks. *See generally* W. Derenberg, *Trade-Mark Protection and Unfair Trading* §§ 16, 18, 23 (1936).

The preamble of section 2 of the Lanham Act states that "[n]o trademark ... shall be refused registration on the principal register on account of its nature", unless one or more specific exceptions to registrability set forth in that section apply. Color is not such an exception.

Congress intended, as shown in the legislative history of the Lanham Act, a broad revision of trademark law achieving "substantive as distinguished from merely procedural rights in trade-marks". S.Rep. No. 1333, 79th Cong., 2d Sess. 5, *reprinted in* 1946 U.S.Code Cong. & Ad.News 1274, 1277. Quoting this report, the Supreme Court has reiterated that:

Congress determined that "a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them."

*Park 'N Fly,* 105 S.Ct. at 661, 224 USPQ at 329.

Implementing this intent, post-Lanham Act courts have declined to be bound by prior decisional law that appeared inconsistent with its purpose. Recognizing the need of business to protect its goodwill and the need of the public to be protected against spurious goods, our predecessor court remarked:

> The legislative history of the Act as a whole describes its objective as making registration "more liberal," dispensing with "mere technical prohibitions and arbitrary provisions" and modernizing the trademark statutes "so that they will conform to legitimate present-day business practice." The basic goal of the Act, which dealt with a good deal more than registration, was the "protection of trademarks, securing to the owner the good will of his business and protecting the public against spurious and falsely marked goods." Accordingly, we consider the pre-Lanham Act decisions presented here to be inapt.

*In re E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1360, 177 USPQ 563, 566 (CCPA 1973) (footnotes omitted).

Under the Lanham Act trademark registration became available to many types of previously excluded indicia. Change was gradual and evolutionary, as the Patent and Trademark Office and the courts were presented with new concepts. Registration has been granted, for example, for containers;[1] product configurations;[2] and packaging;[3] even if subject to design patent pro-

---

**1.** *Ex parte Haig & Haig, Ltd.,* 118 USPQ 229 (Comm'r Pat.1958) (whiskey bottle); *Cf. In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 213 USPQ 9 (CCPA 1982) (household cleaner spray pump container held registrable upon a showing of distinctiveness).

**2.** *In re Minnesota Mining and Mfg. Co.,* 335 F.2d 836, 142 USPQ 366 (CCPA 1964) (triangular shape of a cake of chemical, on the Supplemental Register).

**3.** *In re World's Finest Chocolate, Inc.,* 474 F.2d 1012, 177 USPQ 205 (CCPA 1973) (candy bar wrapping).

tection;[4] for tabs having a particular location on a garment;[5] slogans;[6] sounds;[7] ornamental labels;[8] and goods which take the form of the mark itself.[9] The jurisprudence under the Lanham Act developed in accordance with the statutory principle that if a mark is capable of being or becoming distinctive of applicant's goods in commerce, then it is capable of serving as a trademark.

Color marks, as other indicia, were no longer barred from registration. As for all marks, compliance with the legal requirements for registration depends on the particular mark and its circumstances of use. In determining registrability of color marks, courts have considered factors such as the nature of the goods, how the color is used, the number of colors or color combinations available, the number of competitors, and customary marketing practices. In the case of *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 798, 81 USPQ 430, 432 (3d Cir.), *cert. denied,* 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518, 83 USPQ 543 (1949), the court refused to protect the red and white colors of Campbell's labels on the ground that if Campbell were to "monopolize red in all of its shades" competition would be affected in an industry where colored labels were customary.

The court in *Campbell Soup* referred to the color depletion theory: that there are a limited number of colors in the palette, and that it is not wise policy to foster further limitation by permitting trademark registrants to deplete the reservoir. *See, e.g., Diamond Match Co. v. Saginaw Match Co.*, 142 F. 727 (6th Cir.), *cert. denied,* 203 U.S. 589, 27 S.Ct. 776, 51 L.Ed. 330 (1906); *International Braid Co. v. Thomas French & Sons, Ltd.*, 150 F.2d 142, 66 USPQ 109 (CCPA 1945). This theory is not faulted for appropriate application, but following passage of the Lanham Act courts have declined to perpetuate its *per se* prohibition which is in conflict with the liberating purposes of the Act.

Note the following examples where, in determining registrability of trademarks based on color, the Lanham Act has been applied with exercise of judgment, as Congress intended. In *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381 (CCPA 1960), the court allowed registration of a square red label for use on automobile trailer windows wherein the only distinctiveness of the label was its color. In *In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396 (CCPA 1972), the court allowed registration of a mark consisting of a colored band applied to a computer tape reel of contrasting color. In *Plastilite Corp. v. Kassnar Imports*, 508 F.2d 824, 184 USPQ 348 (CCPA 1975), registration was denied to a combination of yellow and orange colors for fishing floats, on the basis that the color scheme lacked distinctiveness. In *In re Shaw*, 184 USPQ 253 (TTAB 1974), the Board denied trademark registration for green suede book covers on the ground of lack of distinctiveness. The standard for registrability was that the color be arbitrarily applied to the goods, in a distinctive way. Contrary to an absolute prohibition on registrability of color marks, administrative and judicial implementation of the statute illustrates that each case is decided upon its facts.

■ As with utilitarian features in general, when the color applied to goods serves a primarily utilitarian purpose it is not sub-

---

**4.** *Id. See also In re Mogen David Wine Corp.*, 328 F.2d 925, 140 USPQ 575 (CCPA 1964) (wine bottle).

**5.** *Compare In re Levi Strauss & Co.*, 165 USPQ 348 (TTAB 1970) *with In re Kotzin,* 276 F.2d 411, 125 USPQ 347 (CCPA 1960).

**6.** *Roux Laboratories, Inc. v. Clairol Inc.*, 427 F.2d 823, 166 USPQ 34 (CCPA 1970) ("Hair Color So Natural Only Her Hairdresser Knows For Sure").

**7.** Registration No. 916,522 issued to the National Broadcasting Co., Inc. (the notes GEC on chimes) *discussed in* G. Gottlieb, "In Case You Missed It . . .", 62 Trade-Mark Rep. 605 (1972).

**8.** *In re Swift & Co.*, 223 F.2d 950, 106 USPQ 286 (CCPA 1955) (polka dot bands).

**9.** *In re Penthouse Int'l Ltd.*, 565 F.2d 679, 195 USPQ 698 (CCPA 1977) (stylized key logo as jewelry design).

ject to protection as a trademark. *See, e.g., In re Pollak Steel Co.*, 314 F.2d 566, 136 USPQ 651 (CCPA 1963) (registration of reflective fence post coating refused despite *de facto* secondary meaning), and *Sylvania Electric Products, Inc. v. Dura Electric Lamp Co.*, 247 F.2d 730, 114 USPQ 434 (3d Cir.1957) (blue dot on flashbulb not a valid trademark because functional, whether or not a *de facto* secondary meaning had been acquired). In *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924), the Supreme Court refused to authorize exclusive rights in the brown color of a quinine preparation which was due to the presence of chocolate as a masking agent and suspension medium. The Court carefully distinguished that situation from one where the ingredient was "non-essential", "a mere matter of dress", or one where it "merely serve[s] the incidental use of identifying the respondent's preparation". 265 U.S. at 531, 44 S.Ct. at 617. In *Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85, 217 USPQ 252 (S.D.Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir.1983), the court refused to enforce the color "John Deere green" as a common law trademark for front end loaders on the bases that the color green was "aesthetically functional" in that purchasers wanted their farm equipment to match, and that secondary meaning had not been established. Such conditions limit an applicant's right to register a color for its goods, in order to prevent the appropriation of functional product features from the public domain. We thus consider whether the color "pink" may be so characterized.

The Supreme Court has stated "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606, 214 USPQ 1, 4 n. 10 (1983), *citing Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661, 140 USPQ 524, 530–31 (1964). In *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1340–41, 213 USPQ 9, 15–16 (CCPA 1982),

the court looked at the following factors to determine functionality: (1) whether a particular design yields a utilitarian advantage, (2) whether alternative designs are available in order to avoid hindering competition, and (3) whether the design achieves economies in manufacture or use.

No argument has been raised that the color "pink" for OCF's fibrous glass residential insulation violates any of these factors, or that alternative, equally arbitrary designs are not available to other producers of fibrous glass insulation. To the contrary, when the arbitrary color arrangement distinguishes the goods from other sources of the same product, as in *In re AFA Corp.*, 196 USPQ 772 (TTAB 1977), or where a variety of color designs has been utilized by other producers, courts have viewed this as evidence that such design features are primarily non-functional in nature. *See In re Tec Torch Co., Inc.*, 143 USPQ 124 (TTAB 1964) (colors of cables for welding torch serve as trademark); *Ex parte Ohio Knife Co.*, 117 USPQ 449 (Comm'r Pat.1958) (color markings on knife handles may serve as indications of origin).

As with all trademarks, practices in the industry and competitive needs may require recognition, as discussed in *In re Mogen David Wine Corp.*, 328 F.2d 925, 140 USPQ 575 (CCPA 1964) (Rich, J., concurring). By analogy to the shape of the wine bottle in *Mogen David*, depriving the public of the right to color fibrous residential insulation "pink" "(1) does *not* hinder competition and (2) does not take from the goods … something of *substantial* value." *Id.* at 933, 140 USPQ at 582.

In addition to registration under section 2 of the Lanham Act, color marks have been protected by courts under section 43(a) of the Act and under state laws of unfair competition. For example, in *Artus Corp. v. Nordic Co., Inc.*, 512 F.Supp. 1184, 213 USPQ 568 (W.D.Pa.1981), Artus adopted an arbitrary color scheme for its shims utilizing a different color to represent each of fourteen shim thicknesses. Nordic, a competitor, copied the color scheme. The court rejected Nordic's argu-

ment that Artus' color scheme should be denied protection because of functionality and the risk of monopoly, and granted an injunction to prevent a likelihood of confusion in the marketplace.

The colors of cube puzzles have been protected, when such colors were found to have acquired a secondary meaning and were primarily non-functional in nature. *See, e.g., Ideal Toy Co. v. Plawner Toy Mfg. Corp.,* 215 USPQ 610 (D.N.J.1981), *modified,* 685 F.2d 78, 216 USPQ 102 (3d Cir.1982). When these requirements were not met, protection has been denied. *See, e.g., Olay Co., Inc. v. Cococare Products, Inc.,* 218 USPQ 1028, 1045 (S.D.N.Y.), *aff'd mem.* 742 F.2d 1439 (2d Cir.1983) (pink color of beauty lotion had not acquired a secondary meaning); *Water Gremlin Co. v. Ideal Fishing Float Co., Inc.,* 401 F.Supp. 809, 812, 188 USPQ 388, 391 (D.Minn.1975) (color coded fishing floats had not acquired a secondary meaning).

Trademark status of the colors of pharmaceutical products has been vigorously litigated, and although some judicial decisions proceeded on a theory of "palming off", many have afforded relief against imitation of capsule or tablet colors when the facts established that such features were non-functional and had acquired a secondary meaning in the marketplace. *See, e.g., Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.,* 547 F.Supp. 1095, 215 USPQ 769 (D.N.J.1982), *aff'd per curiam,* 719 F.2d 56 (3d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1444, 79 L.Ed.2d 763 (1984), *grant of perm. inj. aff'd,* 747 F.2d 844, 224 USPQ 349 (3d Cir.1984). Following this pattern the Board allowed registration of a tri-colored analgesic tablet where the colors were non-functional and secondary meaning was established, *In re American Home Products Corp.,* 226 USPQ 327 (TTAB 1985), and denied registration to a colored drug capsule where distinctiveness had not been made out, *In re Star Pharmaceuticals, Inc.,* 225 USPQ 209 (TTAB 1985).

■ Thus gradually the courts have rejected the *dictum,* even as it appeared in some cases after passage of the Lanham Act, to the effect that color alone is not subject to trademark. This result is manifest throughout the circuits, exemplified in the decisions cited herein and by the Board. Over the thirty-nine years of the Lanham Act, it has become established that the color of goods, as other indicia, may serve as a trademark if the statutory requirements are met.

As the Board observed, there is no overriding public policy which requires that the color "pink" applied to residential fibrous glass insulation be excluded from the statutory definition of a trademark. It appears from the record that OCF is the only manufacturer that colors this insulation, and that there are only a small number of producers. Applying these considerations the Board found:

> Thus, in a case where there is no competitive need (whether characterized as "aesthetic" or otherwise) for colors to remain available to all competitors, the color depletion argument is an unreasonable restriction on the acquisition of trademark rights. We are confronted with such a case. The record indicates that fibrous glass insulation ordinarily has a light yellow-white coloring. Moreover, there is no evidence in this record of widespread industry practice of dyeing fibrous glass insulation a color different from that which it has as a result of the manufacturing process, nor is there anything in the record suggesting a need to do so.

*In re Owens-Corning Fiberglas Corp.,* 221 USPQ at 1198.

■ We agree with the Board that the color "pink" has no utilitarian purpose, does not deprive competitors of any reasonable right or competitive need, and is not barred from registration on the basis of functionality.

The Board also correctly observed that even if the "pink" color is considered to be ornamental, this does not prevent it from acting as a trademark. Courts have noted that the "line distinguishing between mere ornamentation and ornamentation which is

merely an incidental quality of a trademark is not always clearly ascertainable, the application of legal principles to fit one situation or the other requires proper reflection upon the impression likely to govern the ordinary purchaser in the marketplace." *In re Swift & Co.*, 223 F.2d 950, 954, 106 USPQ 286, 288 (CCPA 1955). *See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204, 203 USPQ 161, 164 (2d Cir.1979).

An overall color is akin to an over-all surface design, for which trademark registration has been held to be available when the statutory requirements are met. *See, e.g., In re Todd Co.*, 290 F.2d 597, 600, 129 USPQ 408, 410 (CCPA 1961) (registration on the Supplemental Register of a pattern of green parallel lines for safety paper products); *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775, 212 USPQ 85, 89 (9th Cir.1981) (protection granted to a mark consisting of an overall pattern of florets and letters). *Cf. In re Soccer Sport Supply Co., Inc.*, 507 F.2d 1400, 1403, 184 USPQ 345, 347 (CCPA 1975) (registration refused for an overall design covering a soccer ball, for lack of distinctiveness).

We agree with the Board that "[d]eciding likelihood of confusion among color shades ... is no more difficult or subtle than deciding likelihood of confusion where word marks are involved." 221 USPQ at 1198. The Board has engaged in such "shade confusion" analysis in the past without apparent difficulty. *See, e.g., Wire Rope Corp. of America, Inc. v. Secalt S.A.*, 196 USPQ 312 (TTAB 1977) (red and yellow strand wire versus red strand wire); *Youngstown Sheet and Tube Co. v. Armco Steel Corp.*, 170 USPQ 162 (TTAB 1971) (Board "can make its own comparison" of grey and orange banded fence post versus orange banded pipe); *In re Hodes-Lange Corp.*, 167 USPQ 255 (TTAB 1970) (registration of yellow banded ampul allowed despite prior registration of bronzy gold banded ampul; it is "of no consequence" that the PTO color designating lines are the same for yellow and gold).

We conclude that OCF's use of the color "pink" performs no non-trademark function, and is consistent with the commercial and public purposes of trademarks. A pink color mark registered for fibrous glass insulation does not confer a "monopoly" or act as a barrier to entry in the market. It has no relationship to production of fibrous glass insulation. It serves the classical trademark function of indicating the origin of the goods, and thereby protects the public, as discussed in the legislative history of the Lanham Act:

> Trade-marks, indeed, are the essence of competition, because they make possible a choice between competing articles by enabling the buyer to distinguish one from the other. Trade-marks encourage the maintenance of quality by securing to the producer the benefit of the good reputation which excellence creates. To protect trade-marks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not. This is the end to which this bill is directed.

S.Rep. No. 1333, 79th Cong., 2d Sess. 4, *reprinted in* 1946 U.S.Code Cong. & Ad. News 1274, 1275.

That a trademark confers no monopoly was settled by the Supreme Court in *United Drug Co. v. Rectanus Co.*, 248 U.S. 90, 97–98, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918):

> [T]he right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his....
>
> In truth, a trade-mark confers no monopoly whatever in the proper sense, but is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol—a commerical signature—upon the merchandise or the package in which it is sold.

OCF's "pink" color mark performs this role. It gives "the public a reliable indication of source and thus facilitates responsible marketplace competition." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 n. 5, 208 USPQ 713, 717 n. 5 (9th Cir.1980) (Markey, C.J., sitting by designation). We do not share the view expressed by the dissent that OCF, having built product goodwill in its "pink" color mark, must have no recourse but product labeling should another manufacturer color its insulation pink.

## II.

The Board, having established the potential trademark character of the color "pink" for fibrous glass residential insulation, nonetheless refused registration on the ground that OCF had not met its burden of proving "that pink functions as a trademark for that insulation." *In re Owens-Corning Fiberglas Corp.*, 221 USPQ at 1199.

OCF argues that the color "pink" has become distinctive of its insulation by virtue of exclusive and continuous use since 1956, and has acquired a secondary meaning in the marketplace. OCF had taken the position before the examiner and the Board that its mark was registrable under section 2(f) of the Lanham Act (15 U.S.C. § 1052(f)), and had submitted extensive evidence in support of acquired distinctiveness.

Section 2(f) provides that "nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of applicant's goods in commerce", codifying the common-law doctrine of secondary meaning. The Board rejected this legal theory, stating that a claim of distinctiveness under section 2(f) is inappropriate when the subject matter to be registered is "believed to be mere ornamentation":

The better approach is to refuse registration of a mark believed to be mere ornamentation on the grounds that applicant has not shown that the ornamentation functions as a mark. Evidence similar to the type of evidence that would be submitted under Section 2(f) may make out a convincing showing that the ornamentation functions as a trademark, and the mark can be registered upon such a showing. *See In re Paramount Pictures Corp.*, 213 USPQ 1111, 1114 (note 8) (TTAB 1982).

*In re Owens-Corning Fiberglas Corp.*, 221 USPQ at 1198 n. 3.

*Paramount Pictures* held that an applicant can rebut an examiner's presumption that a proposed mark is principally ornamental and does not function as a trademark, with evidence that the mark is inherently distinctive. But if a proposed mark is not inherently distinctive, then it can be registered under section 2(f) upon an adequate evidentiary showing that it had acquired a secondary meaning "sufficient to identify an applicant's goods". *Hehr*, 279 F.2d at 528, 126 USPQ at 382. *See also In re Schenectady Varnish Co., Inc.*, 280 F.2d 169, 170, 126 USPQ 395, 396 (CCPA 1960) (registration of a design mark under section 2(f)).

The Board stated that color is "really nothing other than a type of product ornamentation." *In re Owens-Corning Fiberglas Corp.*, 221 USPQ at 1198. We agree that color is usually perceived as ornamentation. While ornamentation is not incompatible with trademark function, "unless the design is of such nature that its distinctiveness is obvious, convincing evidence must be forthcoming to prove that in fact the purchasing public does recognize the design as a trademark which identifies the source of the goods." *In re David Crystal, Inc.*, 296 F.2d 771, 773, 132 USPQ 1, 2 (CCPA 1961) (registration denied for red and blue bands on white socks).

The Board treated applicant's proffered evidence under section 2(f) as evidence to show that the "pink" color *per se* functioned as a trademark for OCF's goods, remarking that the evidence for one "is much like" the evidence for the other. *In re Owens-Corning Fiberglas Corp.*, 221 USPQ at 1198. Although OCF has not

disputed the Board's legal theory, OCF continues to argue for registration under section 2(f). We see no reason in law or policy to prohibit OCF's attempted reliance on section 2(f), and we observe that the Solicitor does not press the Board's approach, but in this appeal argues the sufficiency of OCF's evidence on the basis of the requirements of section 2(f). OCF has the right to draw on the benefits of its twenty-nine years of use and to seek registration in terms of section 2(f).

■ OCF's evidence was examined by the Board and found wanting. We review this conclusion from the viewpoint of compliance with section 2(f). As observed by our predecessor court, the "exact kind and amount of evidence necessarily depends on the circumstances of the particular case", and "Congress has chosen to leave the exact degree of proof necessary to qualify a mark for registration to the judgment of the Patent Office and the courts." *Hehr*, 279 F.2d at 528, 126 USPQ at 383.

■ An evidentiary showing of secondary meaning, adequate to show that a mark has acquired distinctiveness indicating the origin of the goods, includes evidence of the trademark owner's method of using the mark, supplemented by evidence of the effectiveness of such use to cause the purchasing public to identify the mark with the source of the product. The statute is silent as to the weight of evidence required for a showing under section 2(f) "except for the suggestion that substantially exclusive use for a period of five years immediately preceding filing of an application may be considered prima facie evidence." *Hehr*, 279 F.2d at 528, 126 USPQ at 382–83.

OCF submitted extensive affidavit and documentary evidence. Joseph Doherty, OCF's Vice President of Marketing Communications, averred that OCF has advertised the "pink" color mark as applied to fibrous glass residential insulation since 1956; that OCF spent approximately $42,-421,000 on consumer advertising for its "pink" insulation in the media of television, radio, newspapers, and consumer magazines during the period of 1972 through 1981, with an estimated expenditure of $11,400,000 in 1981 alone; and that additional sums were spent on brochures, displays, and other promotional items that highlighted the "pink" color as applied to applicant's insulation.

The Board found OCF's totality of evidence insufficient because it "does not indicate to what extent that advertising has emphasized 'pink' as a mark" and because it does not provide any "indication of the extent to which the sample advertising materials of record (which emphasize the 'pink' mark) have been used." *In re Owens-Corning Fiberglas Corp.*, 221 USPQ at 1199. We have reviewed the showing in light of the Board's criticisms.

In *Roux Laboratories, Inc. v. Clairol Inc.*, 427 F.2d 823, 829 n. 10, 166 USPQ 34, 39 n. 10 (CCPA 1970), our predecessor court noted that "[t]he size of advertising expenditures alone has been found to serve as strong evidence of secondary meaning." The Board has held that it is not essential that evidence of advertising expenditures be directed specifically to the promotion of an applicant's mark, "given the rather substantial evidence of applicant's vigorous promotional efforts in this regard." *In re American Home Products Corp.*, 226 USPQ 327, 330 (TTAB 1985) (the tricolor design of tablets held to have acquired secondary meaning).[10]

---

10. *See also In re Hollywood Brands, Inc.,* 214 F.2d 139, 141, 102 USPQ 294, 296 (CCPA 1954) (secondary meaning found when one-third of $1,135,000 for advertising over six years was devoted to publicizing the mark; affidavits from consumers not essential); *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060, 203 USPQ 401, 402 (2d Cir.1979) (court "properly considered evidence of plaintiff's extensive advertising and sales"); *Ideal Toy Corp. v. Plawner*

*Toy Mfg. Corp.,* 685 F.2d 78, 82, 216 UPSQ 102, 106 (3d Cir.1982) ("factors such as length of use, buyer association, extent of sales and advertising" may be considered in testing secondary meaning); *In re Duvernoy & Sons, Inc.,* 212 F.2d 202, 101 USPQ 288 (CCPA 1954) (extensive advertising of "Consistently Superior" accompanying trade name inadequate to confer trademark status to laudatory statement not relied on to denote origin); 37 C.F.R. § 2.41 (an applicant

OCF submitted to the Examiner and to the Board its network television advertising schedule for the period August 17, 1980 through March 30, 1981. This schedule shows that OCF purchased nearly two hundred separate blocks of network time during broadcasts of major sporting events such as the Super Bowl, the Rose Bowl, the U.S. Tennis Open, and the World Series; prime time network series including "Sixty Minutes", "M*A*S*H*", and "Magnum, P.I."; and network showing of theatrical movies; all to advertise its "pink" insulation. The breadth of this exposure was not challenged by the Board, unlike the submissions in *In re Soccer Sport Supply Co.*, 507 F.2d at 1403, 184 USPQ at 348, where "the evidence fail[ed] to disclose information from which the number of people exposed to the design could be estimated".

The record contains detailed storyboards for two different commercials aired during this time period featuring the "Pink Panther", a pink cartoon character promoting the use of "pink" Owens-Corning Fiberglas insulation. The narration for these commercials discusses how homeowners can cut the high cost of fuel if they would only "[a]dd another layer of pink" in their attics. The scenes emphasize the distinctive "pink" color of OCF's product and reinforce the image with the slogan "Put your house in the pink".

Narration from another television commercial of record told consumers that "[b]lankets of pink Fiberglas insulation around your house could cut your air conditioning bills year after year." The photographic stills for this commercial show an Eskimo in Death Valley staying cool in an igloo encased in a "pink" blanket of OCF's insulation.

OCF's advertising was discussed in an article of record entitled "Mfr. Promotions Boost Insulation Traffic" in the January 5, 1981 issue of *National Home Center News*. The article states that "Owens-Corning's Pink Panther television cam-

paign made the biggest splash" of any manufacturer promotion that year, and describes a nationwide "February Pink Sale" event planned by OCF to include "more network TV Pink Panther commercials, point-of-sale materials and newspaper advertising with dealer listings." It also notes that "O–C has increased its consumer ad budget by several million dollars over last year." The article states that "Forest City buyer, John Ogden reported the powerful impact of the O–C ad campaign at store level. He said some shoppers will no longer buy fiberglass insulation unless it is pink."

Further evidence of promotion of "pink" was submitted in the form of a transcript of a radio commercial. The text included:

If you'd like to keep your house warmer in winter, cooler in summer ... you'll love that "pink." Because now you can wrap your home in the comfort of pink Owens-Corning Fiberglas insulation.... And, right now, in stores where you buy pink Owens-Corning Fiberglas insulation, you can take advantage of our best ever sales event.... You'll never have a better opportunity to "think pink" ... buy "pink" ... install "pink" in time for the severe weather ahead. So, look for the special Pink Panther displays—with complete details—see how easy it is to "put your house in the pink" at [your local dealer].

The record states that OCF advertised in popular consumer magazines including House & Garden, Better Homes and Gardens, Mechanix Illustrated, Popular Mechanics, Popular Science, Changing Times, Home Energy Digest, and House Beautiful; these ads also featured the Pink Panther character. Applicant's submissions show the use of slogans in its advertising, *e.g.*, "Pink of Perfection"; "The Pink Cooler"; "Big Pink"; "Love that Pink"; "Pink Power"; "America's Favorite Pink Product"; "Tickled Pink"; "Put your House in the Pink"; "Up with Pink"; "Prime Time

may submit "evidence showing duration, extent and nature of use and advertising expenditures

..." to support a claim of distinctiveness).

Pink"; "Think Pink"; "Think More Pink"; "Beat the Cold with Pink"; "All that Pink"; and "Plant Some Pink Insulation in your Attic".

OCF's early advertising efforts introduced the "pink" product to its dealers with the explanation that it was "colored pink so your customers will recognize it as the latest and the best!" OCF also submitted evidence of point-of-sale advertising materials that it has supplied to its dealers through the years, many of which were coordinated with OCF's television campaigns. The Board objected that this evidence did not show the extent to which these advertising materials had actually been used by dealers. We conclude that this objection does not outweigh the total evidence of broad distribution and sales efforts in this case.

The record also describes promotion to real estate developers, who were encouraged to "[s]pecify and purchase pink Owens-Corning Fiberglas in each of your houses." OCF offered a variety of "pink" promotional items such as coffee mugs and stuffed animals to developers as sales aids in model homes, stating that the display of such items "lets customers know that you have invested in quality insulation—Owens-Corning Fiberglas." In conjunction with the other evidence submitted, this broad promotion of "pink" in association with OCF's fibrous glass residential insulation is of evidentiary value.

In addition, the record contains consumer survey evidence. This survey was conducted to enable OCF to evaluate an advertising program, but its data are pertinent to the issue. In June 1980 male homeowners were asked the question "To the best of your knowledge, what manufacturer makes pink insulation?". Forty-one percent responded with applicant's name and 14% responded with the name of some other insulation manufacturer. A similar survey in January 1981, after the first Pink Panther television commerical blitz, showed that applicant's recognition rate had increased to 50%.

■■ The Board held that this evidence was not convincing because it did not "establish that those respondents associate pink insulation with a single source." *In re Owens-Corning Fiberglas Corp.*, 221 USPQ at 1198. The Solicitor further criticized the survey on the basis that the way the question was presented inhibited plural responses from persons who might have believed that more than one manufacturer makes "pink" insulation. We do not agree that such criticism requires outright rejection of survey data showing that 50% of the respondents named OCF, the only manufacturer to color its insulation pink.[11] Whether or not this survey alone is conclusive, the results show a syndetic relationship between the color "pink" and Owens-Corning Fiberglas in the minds of a significant part of the purchasing public.

■■ By their nature color marks carry a difficult burden in demonstrating distinctiveness and trademark character. Each case must be considered on its merits. OCF's evidence shows advertising expenditures exceeding $42,000,000; in *Hehr* the advertising expenditures that were deemed adequate to show secondary meaning were about $112,000. Consumer recognition in 1981 as to the source of "pink" insulation was 50%, a percentage considerably greater than that held sufficient in many cases. *See, e.g., Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 217 USPQ 988 (5th Cir.1983), where 23–28% correct responses were held sufficient to establish

**11.** Distinctiveness is acquired by "substantially exclusive and continuous use" of the mark in commerce. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1405, 222 USPQ 939, 942 (Fed. Cir.1984). A color which is employed by others in the industry acts not as an indicator of source but as mere ornamentation. *See, e.g., Van Brode Milling Co., Inc. v. Cox Air Gauge System, Inc.*, 279 F.2d 313, 319, 125 USPQ 510, 514 (9th Cir.1960) (red for automotive accessories); *Black & Decker Mfg. Co. v. Ever-Ready Appliance Mfg. Co.*, 518 F.Supp. 607, 617, 213 USPQ 842, 850 (E.D.Mo.1981), *aff'd*, 684 F.2d 546, 215 USPQ 97 (8th Cir.1982) (almond for kitchen accessories); *Delamere Co., Inc. v. Taylor-Bell Co., Inc.*, 249 F.Supp. 471, 479, 148 USPQ 368, 374 (S.D.N.Y.1966) (pink for cosmetic products).

**1128**

secondary meaning. We conclude that the Board placed an inappropriately heavy evidentiary burden on OCF. As stated in *In re Hollywood Brands, Inc.*, 214 F.2d 139, 141, 102 USPQ 294, 296 (CCPA 1954), there is nothing in the statute "which expressly or impliedly imposes an unreasonable burden of proof upon an applicant for registration thereunder, nor is it within our province to read such rigid provisions into it."

On the totality of the evidence, the Board's finding that the color "pink" does not function as a trademark for OCF's fibrous glass residential insulation is clearly erroneous.

The requirements of the statute having been met, OCF is entitled to register its mark under 15 U.S.C. § 1052(f).

REVERSED.

BISSELL, Circuit Judge, dissenting.

I respectfully dissent.

### I

I adhere to the view that "the law is well-settled today that the overall color of a product ... cannot be a trade identity designation, nor is it entitled to registration." 3 R. Callman, *The Law of Unfair Competition Trademarks and Monopolies* § 18.13 (4th ed. 1983). That was the law long before the 1946 Lanham Act, it continued to be the law after the Act, and it ought to be the law in this case.[1]

### A

More than two decades before the Lanham Act the Supreme Court applied that rule of law in denying trademark protection to the color of a beverage, announcing that "the coloring matter is free to all who can make it if no extrinsic deceiving element is present." *Coca-Cola Co. v. Koke Co.*, 254 U.S. 143, 147, 41 S.Ct. 113, 114, 65 L.Ed. 189 (1920). The district courts also applied the rule prior to the Act. In holding that a razor blade manufacturer prevailed in a suit to prohibit passing off, the court nevertheless held that the manufacturer could not have exclusive use of the color blue, stating that "[a] concern, however, must clearly identify its product by something more distinctive and individual than mere color. ... Color itself is free." *Gillette Safety Razor Co. v. Triangle Mechanical Laboratories Corp.*, 4 F.Supp. 319, 324 (E.D.N.Y.1933). Shortly before the Act, another district court observed that color must be in the form of a design to constitute a trademark and held that a phonograph record manufacturer could have no trademark rights in the color red "for color qua color may not be a trademark." *Radio Corporation of America v. Decca Records*, 51 F.Supp. 493, 495 (S.D.N.Y.1943); *cf. Yellow Cab Transit Co. v. Louisville Taxicab & Transfer Co.*, 147 F.2d 407, 415 (6th Cir.1945) (taxicab company has no exclusive right to the use of the color yellow).

### B

After the Act, all the regional circuit courts that confronted the issue continued to recognize the validity of the rule.[2]

Similarly, the Court of Customs and Patent Appeals has applied the rule. Before

---

**1.** The only issue which the parties treated as present in this case was the establishment of secondary meaning. Accordingly, I believe that the issue of registrability of color per se remains open in an opposition proceeding or in litigation respecting this application or a resulting registration.

**2.** *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161, 195 USPQ 689, 694 (1st Cir.1977) (yellow-colored oval mark; color alone cannot be appropriated as a trademark); *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366, 374 (S.D.N.Y.) (one cannot acquire a trademark by color alone), *aff'd*, 604 F.2d 200 (2d Cir.1979); *Norwich Pharmacal Co.*

*v. Sterling Drug, Inc.*, 271 F.2d 569, 572, 123 USPQ 372, 375 (2d Cir.1959) (pink medicinal liquid; that a color may become someone's exclusive property has been rejected by the courts throughout the years), *cert. denied*, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 798, 81 USPQ 430, 433 (3d Cir.1949) (no exclusive use of half red and half white labels; one cannot acquire a trademark by color alone); *North Shore Laboratories Corp. v. Cohen*, 721 F.2d 514, 523 (5th Cir.1983) (courts have uniformly rejected sanctioning exclusive rights to product color); *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 480, 181 USPQ 611, 615 (5th Cir.1974) (automobile manufacturer has no

the Act the court held that "a mark is not registrable if color alone is its distinguishing characteristic." *In re Canada Dry Ginger Ale*, 86 F.2d 830, 833 (CCPA 1936). After the Act, the court continued to recognize the validity of the rule as it had been expressed in other federal courts. Nearly a decade after the Act the CCPA recognized "the well settled rule that trade-mark rights cannot be acquired in color alone." *In re Swift & Co.*, 223 F.2d 950, 955, 106 USPQ 286, 289 (CCPA 1955) (citing *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 798, 81 USPQ 430, 433 (3d Cir.1949)). More than two decades after the Act the court recognized the validity of the *Decca Records* decision that the use of color must be in the form of a design to constitute a trademark: "Nor are we persuaded that our decision here is contrary to what was said in the Decca Records case." *In re Data Packaging Corp.*, 453 F.2d 1300, 1303, 172 USPQ 396, 398 (CCPA 1972). More recently, in denying registration to a yellow and orange fishing float, the court stated: "Color or colors used as mere surface decoration cannot be monopolized by a claim to trademark rights therein." *Plastilite Corp. v. Kassnar Imports*, 508 F.2d 824, 826, 184 USPQ 348, 350 (CCPA 1975).

The development of the jurisprudence under the Lanham Act distills into this rule: "A color, per se, is not capable of appropriation *as a trademark*." 1 J. McCarthy, *Trademarks and Unfair Competition* § 7:16 (2d ed. 1984) (emphasis added).

### C

The Act does not require the result the majority reaches, nor is there any per-

suasive reason for this court to discard decades of jurisprudence in order to extend *trademark* protection to color per se. There are at least four reasons for this court not to discard this established jurisprudence.

First, the majority's result ignores the principle of comity. Unlike our exclusive jurisdiction over patent law, this court's jurisdiction over trademark law is shared with the regional circuits. While the decisions of the regional circuits are certainly not binding precedent on this court, they are entitled to at least a modicum of respect and deference. This deference is especially due where there is such a unanimity among circuit courts which have primary responsibility for determining infringement and equal responsibility with this court for determining registrability of a mark under 15 U.S.C. § 1071(b)(1) (1982).[3] Even if we had exclusive jurisdiction over trademark law, we should not lightly cast aside a settled interpretation of a statute. There is a valuable public interest in consistency and predictability in the law. Lawyers have advised clients, clients have conducted their affairs, litigants have won and lost and settled, all in light of the interpretation universally applied in the federal courts. Discarding the established jurisprudence and breaking away from the lines of decisions in the regional circuits will have a divisive effect on the trademark law. To create such a fundamental division in the law is directly contrary to this court's mandate to bring uniformity to the law and will inevitably invite forum-shopping.

Second, there is no need to create such a division in the law. The current interpreta-

---

rights in color blue per se); *Tas-T-Nut Co. v. Variety Nut & Date Co.*, 245 F.2d 3, 6, 113 USPQ 493, 495 (6th Cir.1957) (clear that one could acquire no proprietary right in the color or colors used on its packages, as such); *Life Savers Corp. v. Curtiss Candy Co.*, 182 F.2d 4, 9, 85 USPQ 440, 443 (7th Cir.1950) (no exclusive use of multi-colored stripes on packaging; color cannot be monopolized to distinguish a product); *Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85 (S.D.Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir.1983); *Mershon Co. v. Pachmayr*, 220 F.2d

879, 883, 105 USPQ 4, 7 (9th Cir.) (white line on green recoil-pad; color alone cannot be protected as a mark), *cert. denied*, 350 U.S. 885, 76 S.Ct. 139, 100 L.Ed. 780 (1955).

**3.** Moreover, there is no point in granting a registration which will not be recognized by the regional circuits (nor, for that matter, by this circuit which must follow the law of a regional circuit on questions of trademark infringement).

tion of the Act adequately protects the use of color as an *element* of a trademark.

Even though color itself alone cannot be protected as a trademark, this court and the regional circuit courts, consistent with the rule expressed in *Decca Records,* have permitted registration of a trademark which used color in a particular design or in an arbitrary or distinctive design. *See, e.g., In re Data Packaging Corp.,* 453 F.2d at 1303, 172 USPQ at 398; *In re Todd Co.,* 290 F.2d 597, 600, 129 USPQ 408, 410 (CCPA 1961); *In re Hehr Manufacturing Co.,* 279 F.2d 526, 528, 126 USPQ 381, 383 (CCPA 1960); *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 161, 195 USPQ 689, 694 (1st Cir.1977); *Campbell Soup Co. v. Armour & Co.,* 175 F.2d 795, 798, 81 USPQ 430, 433 (3rd Cir.1949); *Life Savers Corp. v. Curtiss Candy Co.,* 182 F.2d 4, 9, 85 USPQ 440, 443 (7th Cir.1950); *Mershon Co. v. Pachmayr,* 220 F.2d 879, 883, 105 USPQ 4, 7 (9th Cir.1955).

Unfortunately for Owens-Corning, the *Decca Records* rule cuts against it in this case. Color uniformly applied to a product is *not* a design because it has not been used in connection or combination with or impressed in some definite arbitrary symbol or design. This is the crucial distinction between this case and the *In re Todd Co.* and *Vuitton et Fils* cases cited by the majority.

Third, there is a reason not to change the law on the factual setting of this case. Changing the law based on the peculiar factual circumstances of this case might create a barrier to otherwise lawful competition in the home insulation trade. Since Owens-Corning on the record before us appears to be the only manufacturer in the trade applying a color to its product and since the majority disparages the color depletion doctrine, the majority finds no public policy reasons for refusal of registration. However, by reason of the dominance of Owens-Corning in the field (its advertising claims a 75 percent market share), pink insulation has become virtually synonymous with home insulation. Thus, new entrants may be unable to effectively

compete if barred from making pink insulation. Indeed, the record reveals that Owens-Corning dominates the field to such an extent that "some shoppers will no longer buy fiberglass insulation unless it is pink." *Cf. Deere & Co. v. Farmhand, Inc.,* 560 F.Supp. 85, 98 (S.D.Iowa 1982) (green farm equipment; protecting "John Deere green" would hinder competition), *aff'd,* 721 F.2d 254 (8th Cir.1983).

The "property" in a trademark is the right to prevent confusion, not to bar new entrants into the market. As was stated by Chief Judge Markey, in a trademark infringement case:

A "trademark" is not that which is infringed. What is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation.

. . . .

... The trademark laws exist not to "protect" trademarks, but, as above indicated, to protect the consuming public from confusion, concomitantly protecting the trademark owner's right to a non-confused public.

*James Burroughs, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274, 276, 192 USPQ 555, 562, 563 (7th Cir.1976) (Markey, *C.J.,* sitting by designation).

I believe the law in these circumstances limits protection against confusion with respect to such goods to effective labeling. As another court stated:

Palming off is the proper issue, not color.

Even though "mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying," we recognize that the right to copy unpatented articles is not absolute. *Sears [Roebuck & Co. v. Stiffel],* 376 U.S. at 232, 84 S.Ct. at 789 [1964]. The Supreme Court suggests that when there is confusion as to who manufactured nearly identical goods, a court may appropriately require that "goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source."

*North Shore Laboratories Corp. v. Cohen,* 721 F.2d 514, 523 (5th Cir.1983).

Accordingly, refusal of registration does not mean that Owens-Corning is without relief should a competitor attempt to "palm off" its goods as those of Owens-Corning. *See Winthrop Chemical Co. v. American Pharmaceutical Co.,* 94 F.2d 587, 588 (2d Cir.1938) (use of pink as color of tube of same size and shape as plaintiff's tube enjoined as a part of plan to palm off products). However, even under the doctrine of unfair competition, there may be a legitimate purpose to consumers which is served by a competitor producing a product of the same color. *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 858, 102 S.Ct. 2182, 2190, 72 L.Ed.2d 606 (1982) (blue capsules; "legitimate reason for producing imitative product").

The final reason for the general rule that denies to one the appropriation of a particular color is that infringement actions could soon denigrate into questions of shade confusion. As one trial court stated concerning its discussion with counsel regarding the practical difficulty of enjoining the use of "John Deere green": "The practical problems identified in this discussion lend credence to the 'shade confusion' rationale for denying protection of color under the Lanham Act." *Deere & Co.,* 560 F.Supp. at 97 n. 20. Considering that registrations are printed only in black and white, 37 C.F.R. § 2.52(e), and have only code linings for color (pink and red being the same), registration will add only greater imprecision.

There are such sound reasons against altering the rule that I am convinced this rule should continue to be applied. Since color per se does not have trademark significance and does not fall into the realm of registrable matter as contemplated by the Act, I would affirm the result that Owens-Corning is not entitled to register its asserted mark.

## II

Alternatively, even if color itself could be capable of trademark significance, I would affirm based on the Board's finding that Owens-Corning failed to prove secondary meaning. That finding is not clearly erroneous. *See In re Loew's Theatres, Inc.,* 769 F.2d 764, 769–70 (Fed.Cir.1985); *Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1578, 222 USPQ 665, 666 (Fed. Cir.1984).

Owens-Corning relied on affidavit evidence to establish the acquired distinctiveness of its asserted mark. The Board carefully considered the evidence and concluded that the proof was insufficient; the Board found that pink did not function as a trademark for the insulation. I agree with the majority that color marks carry a difficult burden and that each case must be considered on its own merits. I do not agree that the Board placed too heavy a burden on Owens-Corning.

As the Board explained:

The affidavit evidence of record recites applicant's advertising expenditures for its insulation but does not indicate to what extent that advertising has emphasized "pink" as a mark. There is, moreover, no indication of the extent to which the sample advertising material of record (which emphasize the "pink" mark) have been used. Even that survey evidence of consumer recognition does not make a convincing showing that purchasers of insulation associate pink insulation *exclusively* with applicant. Stated differently, that some 50% of male homeowners who responded to the survey question knew that applicant makes insulation that is pink does not establish that those respondents associate pink insulation with a *single* source.

*In re Owens-Corning Fiberglas Corp.,* 221 USPQ 1195, 1199 (TTAB 1984) (emphasis added).

For example, what is wrong with the survey can be illustrated by comparing a different product, yellow legal pads. Owens-Corning's question about insulation is like asking lawyers whether they know any company that puts out yellow legal pads. The question does not evoke an answer

that relates to the source of all such goods. What is wrong with the advertising evidence is that it fails to give any indication of the proportion of expenses allocated to promoting pink as an indication of source, a failure which can only result in guesswork by the court. Since Owens-Corning failed to carry its burden under the most minimal standard of proof it is difficult to understand how the Board imposed an improperly heavy burden.

The Board's evaluation of the evidence leading to its finding that Owens-Corning failed to establish that pink insulation is associated with a single source does not evoke a "definite and firm conviction that a mistake has been made." *United States v. United States Gypsum Co.*, 333 U.S. 364, 365, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Accordingly, its finding cannot be regarded as clearly erroneous and must be affirmed.