THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
July 15, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Lorillard Licensing Company, LLC
_____

Serial No. 76680117
_____

Howard A. MacCord, Jr. of MacCord Mason PLLC for Lorillard Licensing Company, LLC.

Teresa Rupp, Trademark Examining Attorney, Law Office 106 (Mary I. Sparrow, Managing Attorney).[1]

_____

Before Seeherman, Cataldo and Lykos, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Lorillard Licensing Company, LLC has appealed from the final refusal of the trademark examining attorney to register the mark shown below for cigarettes.[2]

_____

[1] Ms. Rupp retired from the U.S. Patent and Trademark Office after briefing was completed, at the point that the appeal was ready for decision.

[2] Application Serial No. 76680117, filed July 31, 2007, and claiming first use and first use in commerce in 1984.



The description of the mark, as ultimately amended, is:

> The mark consists of the colors green and orange in combination as applied to the packaging for the goods and displays associated with the goods. The matter in the drawing shown in broken lines serves to show positioning of the mark and is not part of the mark. The color green is used as the background color for the packaging and displays associated with the goods. The color orange is used to display textual elements with the green background field. No claim is made to the literal content of any particular textual element. The dotted outline of the packaging of the goods is intended to show the position of the mark and is not a part of the mark. Neither the package shape, nor the lettering, nor the wording form a part of the mark.

Thus, applicant is claiming as its mark the color combination of orange and green, with orange used for the textual elements and green for the background, but without any limitation as to what textual matter is shown in

2

orange, or where the orange textual matter appears on the green background.

The examining attorney has refused registration on two bases: 1) The drawing is unacceptable because it is not a substantially exact representation of the proposed mark as it appears on the specimen; and 2) the proposed mark fails to function as a mark and the evidence of acquired distinctiveness submitted by applicant is insufficient to demonstrate that it is a mark.

The appeal has been fully briefed. The examining attorney noted that applicant, in its appeal brief, made reference to a third-party application (hereafter the "Fred Martin application") that the examining attorney had examined some years previously (which applicant pointed out issued as a registration, albeit one that was subsequently cancelled under Section 8), and the examining attorney also noted that this application was not made of record.[3]

---

[3] We further note that in its request for reconsideration filed December 10, 2009 applicant made a tangential reference to this application (stating that "as in the case of a yellow and green color combination that examining attorney Rupp approved in serial number 76/359,112, the undersigned includes evidence that applicant's color scheme has acquired distinctiveness as a source indicator.") p. 6. Given the nature of the reference, and the fact that it was made in a request for reconsideration, we do not treat the examining attorney's failure to advise applicant that the reference was insufficient to make the Fred Martin application/registration of record as a waiver of any objection to the application/registration. The examining attorney denied the request for reconsideration on March 3, 2010, and applicant

However, she did not specifically object to the application, but discussed the applicant's comments. In view thereof, we have considered the application only to the extent that information about it can be ascertained from applicant's and the examining attorney's comments.

With respect to the briefs, we note that with its brief applicant submitted almost 200 pages of exhibits which had previously been made of record. As a general rule, the Board discourages attaching such material to briefs. See In re SL&E Training Stable Inc., 88 USPQ2d 1216, 1220 n.9 (TTAB 2008) (attaching as exhibits to brief material already of record only adds to the bulk of the file, and requires Board to determine whether attachments had been properly made of record); In re Thor Tech Inc., 85 USPQ2d 1474, 1475 n.3 (TTAB 2007) (attaching evidence from record to briefs is duplicative and is unnecessary). We appreciate in this case that, because applicant has made many thousands of pages of evidence of record, applicant

---

had no option to respond to that office action. The appeal was then resumed, and applicant filed a request with the Board for remand, which was granted, and this allowed the examining attorney to consider an amendment filed May 12, 2010. That included the text of the customer and dealer statements from the Fred Martin application, but again, the examining attorney's failure to advise applicant that the application file/registration was not of record is not considered to be a waiver of such an objection since at that point applicant had no opportunity to respond to the action issued during the remand and rectify the record.

might have considered it helpful to the Board to include these exhibits with its brief. That might have been true if applicant had submitted one or two illustrative exhibits. However, when the attachments to a brief number hundreds of pages, the usefulness of attaching them is greatly diminished. It is suggested that in such a circumstance it is far more helpful to identify, by the date of submission and the page numbers in the Office's TDR (Trademark Document Retrieval) database, the material which is referred to in a brief.[4]

The examining attorney's objection to the drawing is that it is a mutilation of the mark shown in the specimen because applicant seeks to register the color orange for the textual material without including the text which appears in orange. The specimen looks very much like the drawing, except that the words NEWPORT PLEASURE! FIRE IT UP! are part of the actual specimen,[5] while in the drawing these words are depicted in dotted lines and therefore are

---

[4] We also note that during the prosecution of its application applicant resubmitted with its responses exhibits that it had previously submitted with earlier responses. This is not helpful to the examining attorney or the Board. It is far better to simply identify an exhibit that was previously submitted by the date of the submission and the TDR page numbers, than to submit another copy.

[5] Applicant has explained that the specimen is a sleeve which is used to slip over and bind two packs of cigarettes and is therefore packaging for the goods.

not part of the claimed mark.  The examining attorney asserts that the color orange does not make a separate commercial impression apart from the text.  In effect, this objection and the refusal on the ground that the applied-for matter does not function as a mark have the same basis: in the examining attorney's view, consumers do not view the mere color combination of orange textual matter (without regard to the text itself) on a green background as a mark indicating a single source for cigarettes.

We point out that the examining attorney is not objecting to the drawing because it depicts more than one mark.  The examining attorney had previously raised such an objection, stating in the March 10, 2008 Office action that the color combination could be used in numerous ways, each of which would create a different commercial impression, and noting that two prior applications filed by this applicant had been refused on this basis.  However, in the December 2, 2008 Office action the examining attorney specifically withdrew that refusal.  Therefore, although in the March 3, 2010 Office action the examining attorney stated that the placement of the orange text on the green background could vary, or that different percentages of orange and green could appear based on the amount of text, we do not regard this to be a reinstatement of the earlier

6

refusal.  Instead, we consider it to be further explanation for her requirement that applicant submit a drawing that shows the mark as it appears on the specimens, i.e., with the words that are currently depicted in dotted lines in the drawing (thereby indicating that the words are not claimed as part of the mark), shown in solid lines as part of the mark.[6]

With respect to the refusal that applicant's proposed mark is a mutilation, there is no question, simply by reviewing the specimen and considering the description of applicant's mark, that applicant has excised the text shown in orange in the specimen from the orange color in which the text is shown, by depicting the text in the drawing in dotted lines.[7]  In this respect, the situation is analogous

---

[6]  Because the examining attorney withdrew the refusal on the basis that applicant's proposed mark consists of more than one mark, that issue is not before us.  In view thereof, we make no comment about whether or not such a refusal would be appropriate or even preferable in a situation in which an applicant attempts to use dotted lines to indicate a mark in which the textual matter changes.  Cf. International Flavors & Fragrances Inc., 183 F.3d 1361, 51 USPQ2d 1513 (Fed. Cir. 1999).

[7]  In many "mutilation" cases the issue is variously discussed as the specimens being unacceptable because they do not support use of the mark shown in the drawing, or the drawing being unacceptable because it is not a substantial representation of the mark shown in the specimen.  See, for example, In re San Diego National League Baseball Club, Inc., 224 USPQ 1067 (TTAB 1983).  As a result, examining attorneys have variously required the applicant to submit a substitute drawing or substitute specimens to overcome the refusal.  In the present case, it is clear that applicant seeks to register the orange color for *any text* appearing on a green background, without regard to the text shown in the orange color.  Therefore, there would have been no

to those cases involving marks in which the material sought to be registered is an inseparable part of the mark depicted in the specimen. See In re Volante International Holdings, 196 USPQ 188 (TTAB 1977) (applicant attempted to register a background design, essentially extracting from the specimen the word VIRGIN which was intertwined with the pictorial design; In re Mango Records, 189 USPQ 126 (TTAB 1975 (applicant sought to extract the word MANGO from an elaborate background and register it as a separate mark).

Although applicant has, in effect, chosen to register only part of the mark shown in the specimen, that in itself is not prohibited. An applicant may seek to register any portion of a composite mark if that portion presents a separate and distinct commercial impression. In re 1175854 Ontario Ltd., 81 USPQ2d 1446 (TTAB 2006). However, the material that applicant seeks to register of *any* orange-colored text on a green background must make a distinct commercial impression apart from the words "Newport Pleasure Fire It Up!" in that color shown in the specimens. See In re Yale Sportswear Corp., 88 USPQ2d 1121 (TTAB 2008). Given the very nature of the manner in which the orange-colored text appears in the specimens, the words,

---

point in the examining attorney objecting to the *specimen*, or requiring substitute specimens.

including their sound when spoken and their connotation,
clearly have an impact on the consumer, and would cause a
consumer to view the "mark" shown in the specimens as
consisting of the words "Newport Pleasure Fire It Up!" and
not merely the orange color in which these words appear.
Accordingly, in order to determine whether the orange color
on a green background, apart from the text which appears in
that orange color, creates a separate commercial impression
and therefore a separate and distinct trademark in and of
itself, we must look to applicant's efforts to create that
separate impression.

In this respect, our analysis is the same as that
which we apply in considering the refusal brought under
Sections 1, 2 and 45 of the Act that the applied-for matter
does not function as a mark.  That is, if the combination
of non-specific text depicted in orange on a green
background makes a separate commercial impression apart
from the text itself, applicant's drawing is not a
mutilation of the mark, and the proposed mark shown in the
drawing functions as a mark.  We therefore turn to the
refusal on the basis that the proposed mark does not
function as a mark.

Applicant asserts that the proposed mark has acquired
distinctiveness and is registrable under the provisions of

9

Section 2(f) of the Act, 15 U.S.C. § 1052(f). In order to obtain a registration under the provisions of Section 2(f), applicant has the burden of demonstrating that its mark has acquired distinctiveness. Moreover, the greater the descriptiveness or non-distinctiveness of the proposed mark, the greater the burden is on an applicant to demonstrate acquired distinctiveness. See Yamaha International Corp. v. Hoshino Gakki Co. Ltd., 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988) ("the greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning"). Because applicant is seeking to register what people could reasonably see as merely a color pattern on packaging, the burden to prove that this combination is viewed as a trademark for cigarettes is necessarily greater than if this were, for example, a surname (for which a statement of substantially exclusive and continuous use for five years is normally sufficient).

Applicant has quoted the language in Yamaha in arguing that "since this case is not about a descriptive mark, the burden [on the applicant to prove secondary meaning] is relatively low." Reply brief, p. 8. To the extent that applicant believes that the term "descriptiveness" in Yamaha refers to traditional merely descriptive word marks,

10

and that it is only such marks for which there is a heavier burden in proving acquired distinctiveness, the case law does not support applicant's position. Yamaha itself involved the registrability of two guitar peg head configurations/designs, rather than a traditional word mark. As the Board stated in In re Chevron Intellectual Property Group LLC, 96 USPQ2d 2026, 2030 (TTAB 2010):

> The kind and amount of evidence necessary to establish that a mark has acquired distinctiveness in relation to goods or services depends on the nature of the mark and the circumstances surrounding the use of the mark in each case. Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd., 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988) (where the product design sought to be registered was common or ornamental, applicant has an "unusually heavy burden" to show acquired distinctiveness); In re Owens-Corning Fiberglas Corp., 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985) ("By their nature color marks carry a difficult burden in demonstrating distinctiveness and trademark character. Each case must be considered on its merits"); In re Water Gremlin Co., 635 F.2d 841, 208 USPQ 89, 91 (CCPA 1980) ("One who chooses a commonplace design for his package … must expect to have to identify himself as the source of goods by his labelling or some other device").

Accordingly, applicant has a heavy burden in this case to establish that the applied-for matter has acquired distinctiveness and is perceived as a trademark for its goods. We therefore turn to consider the evidence submitted by applicant.

Applicant has submitted two declarations by Victor D.

11

Lindsley, Senior Group Brand Director of Lorillard Tobacco

Company, the exclusive licensee of applicant. The first

declaration, signed on April 27, 2006, was originally

submitted in connection with a different application,

Serial No. 78662069, and because of when it was prepared,

does not contain current information for the sales of

applicant's product and use of its asserted mark.

According to the declaration, applicant or its licensee

(hereafter we will refer to both as "applicant") uses the

orange and green color combination for NEWPORT cigarettes.

Since 1984 until the 2006 date of the declaration applicant

sold "over a half a trillion cigarettes" in the United

States in connection with the orange and green color

combination. Between 1997 and the 2006 date of the

declaration it spent $165 million advertising cigarettes in

connection with the orange and green color combination, and

used the orange and green color combination in outdoor and

point-of-sale advertising starting in the mid 1970s, with

the combination used for outdoor advertising until 1998.

Applicant began testing the orange and green color

combination in 1984 in "Sport" magazine and then expanded

the coloration to "all magazine advertising publications."

We have some problems with the probative value of this

declaration. As an aside, we note that listing the number

12

of cigarettes sold appears to us to be somewhat misleading, as there is no indication that applicant's cigarettes are sold as single cigarettes, but are sold in packs/boxes or cartons. More importantly, the cigarettes themselves, and the boxes of cigarettes as shown in applicant's advertisements, do not use the orange and green color combination; on the contrary, the dominant color on the packs is blue, with white as a background color. Second, the advertisements submitted as Exhibit C, representing "a collection of Lorillard advertisements that were run between 1984 and 2003," do not consistently show orange lettering on a green background. For example, the first ad in this exhibit (marked "PRINT 2003") has the orange words on a photograph that has primarily blue colors; there is a green border around the photograph, but it does not form the background for the orange text. The same is true in other advertisements in this exhibit. In yet other ads, there are multiple strong color fields, so that the green background would not be recognized as background, but merely as another color block. For example, the third ad (marked "PRINT 2001") has a photograph of a woman in a red shirt holding up a large yellow shawl while a man in a blue football shirt and red pants is charging it like a bull. The words "NEWPORT PLEASURE!" appear in orange across the

13

top of the picture, and part of the "N" and the "T" in NEWPORT, and the final "E" and exclamation point in PLEASURE! extend on to green color blocks which are approximately one inch on either side of the upper half of the ad. The only thing that appears consistent in these ads is the orange color and font in which NEWPORT and some of the other text appears, but we certainly do not view this sample of ads as showing a consistent use of orange text on a green background that would show that this color combination is functioning as a trademark, or that the color orange functions as a mark separate from the word NEWPORT or other text. Thus, we cannot treat the figure of $165 million spent on advertising as evidencing the expenditure for advertising the proposed mark.

Exhibit D to that declaration is "a collection of images of product packaging for the cigarettes and promotional items offered in connection with the cigarettes that were used by Lorillard between 1985 and 2003." The sub-exhibits show, for example, a belt buckle in a blister pack with the statement that it is free with a carton of Newport (sub-exhibit marked 1985). The background is green, the word NEWPORT is in orange, and the rest of the text is in white. Another sub-exhibit (marked 1990) is for a free water bottle with the purchase of Newport. The

14

words "Free" and "Newport" are in orange, with "Free" on a white background and "Newport" on what is presumably a green background,[8] and the other text on this green background is in white. A third sub-exhibit (marked 1994) for a free cooler with the purchase of cigarettes shows the words "Free!" and "Newport" in orange lettering, but they are on a white background. In short, the group of images of product packaging that applicant believes shows "consistent use of the orange and green color combination" shows no such thing. It certainly does not show that the matter for which applicant seeks registration, namely, any orange text that is used on a green background, is used in such a manner that consumers would recognize such depiction as a trademark for cigarettes.

Mr. Lindsley's second declaration was prepared for the present application, and signed on February 10, 2009. With the declaration he included "Work Plan booklets" for various quarters of 2006 through 2009. These booklets are issued by applicant to its field sales force to instruct them how to arrange displays of applicant's cigarettes in retail settings, and Mr. Lindsley stated that in his experience looking at retail locations where Newport

---

[8] In the reproduction that is in the Office records this color looks more blue than green.

cigarettes are sold, the work plans are followed.  He also stated that cigarettes are maintained on shelves behind a counter, and that a "display covered with the mark made up of a combination of a green background and orange text help the customer tell the store clerks the desired cigarettes associated with the mark to retrieve for the customer."

The booklets depict the point of sales displays, including price information, and in virtually all of the displays for Newport cigarettes the text, for example, "Newport," "Newport pleasure!" or "Newport Lights" is shown in an orange color on a green background, although in a few instances words in orange are not on a green background. For example, in three of the four work plan booklets submitted with the Lindsley declaration, there are displays in which the word "pleasure!" in orange is superimposed over a picture of a Newport cigarette pack, which is blue, not green.  Also, there are instances in which text appearing on the green background is in a color other than orange; in the 2007 second quarter work plan, below "Newport Pleasure Payday" in orange, is "Win $500,000!" in yellow.  We also note that "Newport," and often "Newport Pleasure!," is depicted in a particular font that is shown consistently in all of the advertisements, packaging and promotions.

16

In addition to the declarations, applicant has submitted over 10,000 statements, with 6500+ from "customers" and 4100+ from dealers, purportedly to show that the proposed mark is recognized as a mark. We reproduce a customer statement in its entirety:

CUSTOMER STATEMENT OF SECONDARY MEANING

To Whom It May Concern:

I am a customer of Newport cigarettes and have purchased at least one pack of Newport cigarettes. Also, as a frequent visitor of convenience stores, I have noticed the distinctive orange and green coloring of Newport's point of purchase displays and advertising. I have come to look upon the orange and green coloring as a symbol identifying Newport cigarettes only and not of any other company in this field.

The form has space for the signer to list the date, and sign and print his or her name.

Despite the large number of customer declarations submitted, we do not find them to be very probative. Of most concern is the definition of a customer, which includes, according to the form, anyone who has ever purchased one pack of Newport cigarettes. The view of someone who has purchased only one pack of Newport cigarettes, or has purchased one or more packs of Newport cigarettes years ago, is not competent to reflect whether current purchasers of Newport cigarettes recognize the

17

applied-for matter as a trademark.  We are also troubled by the lack of information about the people who signed these forms, or the conditions under which they signed them, or their understanding of what they were signing.  We acknowledge that form statements may be used to show acquired distinctiveness, and that it is not necessary that the forms include a declaration as provided in Trademark Rule 2.20.  However, this does not mean that all form statements and all forms without declarations will have equal probative value with personal statements and those signed with the safeguards of a Rule 2.20 declaration.  We do not know how much deliberation the people signing these statements gave them, or whether they understood what the forms meant.  The form statements would have been far more effective if, for example, the signers were shown gibberish text in an orange color on a green background, so that they knew that the "orange and green coloring" mentioned in the form meant such coloring without regard to the words or the type font in which they appeared.  We also do not know whether the signers were all located in the same city, or whether they represent any geographic diversity.  We do note that there are many instances where the same surname appears twice in a row, suggesting that the signers may be related, thereby limiting how representative the sample is.

18

Although the present situation is not the same, we think the comments we made with respect to declarations submitted in In re EBSCO Industries Inc., 41 USPQ2d 1913, 1916 (TTAB 1996), which involved the registrability of a configuration of a fishing lure, are pertinent:

> These eight declarations do not indicate why the declarants are qualified to make their attestations, e.g., the declarations do not identify the declarants, as was the case with the prior set, as having a lengthy experience in fishing, or having any role in the sport. The only information given for each declarant, other than name and address, is that "I am familiar with various fishing lures which are known as 'chuggers' and 'poppers.'" There is no information as to how and why they are familiar with these lures.
>
> These declarations also deserve little weight because we have doubts as to whether they actually reflect the views of the declarants. As the Examining Attorney has pointed out, the declarations are forms, with the declarant filling in only his name and address. The fact that form declarations are used is not necessarily a fatal flaw. However, in this case, each declaration makes reference to "the 'POP-R" which is shown in the attached drawing," yet none of the declarations contains such a drawing. We have serious concerns as to the degree of consideration given to the declarations by the declarants when the missing drawing was not noticed, particularly since the focus of the declaration is supposed to be the configuration shown in that drawing.

As for the dealer statements, they are longer, stating as follows:

DEALER/SUPPLIER STATEMENT OF PROOF OF SECONDARY MEANING

To Whom It May Concern:

The undersigned states that he/she is a retailer of cigarettes, including Newport cigarettes made by Lorillard Tobacco Company.  My business is located at _____.  In the course of my business, I have had occasion to come in contact with many tobacco products and am familiar with Newport cigarette products and advertising, which includes the orange and green advertising and point of sale displays as seen in retail locations, including mine.

It is my understanding that the orange and green colors, showing Newport cigarettes, indicates the goods produced by Lorillard Tobacco Company and not by any other company.

It is my understanding that the orange and green color in the advertising and point of sale displays has acquired in the trade the meaning of Newport cigarettes produced by Lorillard Tobacco Company.

Numerous of my customers acknowledge the orange and green color on the advertising or point of sale displays of Lorillard Tobacco Company, and refer to these colors when referencing Lorillard Tobacco Company's Newport cigarettes.

At the bottom of the statement the dealer has filled in the date, his or her name and signature, and title, and in the body of the statement has provided the address of his or her business.

These statements provide somewhat more information than the customer statements, since they do identify an address for the signer's business, and therefore we know

20

that the signers' businesses are located throughout the United States. However, there is no indication of the name or nature of the retail establishment, or whether the sale of cigarettes is a noticeable or significant part of the business, such that we could judge whether the "numerous of my customers" for cigarettes represents a significant number. We are also concerned about the rather vague and general nature of the statement which the retailers have signed, specifically, there is no information regarding the way customers have "acknowledge[d] the orange and green color on the advertising or point of sale displays," or "refer to these colors when referencing" applicant's cigarettes. The second paragraph of the statement says that "the orange and green colors, showing Newport cigarettes, indicates the goods produced by [applicant]." The retailer may read that statement as indicating that the term "Newport" is used with the orange and green colors, and therefore the further statements about customers referring to the orange and green colors when referencing applicant's cigarettes may be informed by the prior statement. In view of the fact that these form statements were prepared by applicant's attorney, rather than being spontaneous statements by the signers, it is odd that the statements do not clearly indicate the proposed mark for

21

which applicant is seeking registration, so that we could be sure that consumers recognize not merely that the colors orange and green are used by applicant for its cigarettes, but that consumers understand this color combination per se identifies the source of the cigarettes, no matter what text appears in orange, or the font of that text, or the amount of text or its placement on the green background.

At this point it is necessary to comment on the number of statements that applicant submitted. Applicant apparently believes that the more statements there are, the stronger the evidence that the mark has acquired distinctiveness. In fact, in its brief applicant compares the number of its declarations to those submitted in a third-party application, Serial No. 76359112 (mentioned earlier in this opinion in connection with the fact that it was not made of record), which resulted in a registration, stating that its 6,595 consumer statements "are some 650-fold the number that convinced the examining attorney in the Fred Martin case," and that the 4,197 statements of cigarette retailers were "over 400 times as many as were sufficient for Fred Martin." p. 22. However, it is not the sheer number of statements (or affidavits or declarations) that determine how probative they are. Although a very small number of statements, when consumer

22

goods are involved, might be considered insufficient to show widespread recognition of a mark, 10,000 statements is no more probative than 1,000 or 100. Rather, it is what the statements say that is important. Thus, it would have been far preferable if applicant had provided a significantly smaller number of personal statements from retailers that indicated the type of establishment they have, the number of cigarettes in general and Newport cigarettes in particular that they sell and, most importantly, what customers have said that caused the retailers to believe that the customers recognize the orange and green color, without regard to the text, as a source-identifier of cigarettes. Similarly, we would find much more probative a substantially smaller number of consumer declarations that indicate where the consumers are from, that they are current purchasers of cigarettes, and a clear indication that they are aware of what the proposed mark is and that they view it as a trademark. As indicated above, this could be done by showing the customer a picture in which random letters are depicted in orange on a green background. Simply put, the submission of a very large record consisting of materials that are not particularly probative of the issue under appeal is far less effective than submission of a more reasonably sized record

23

consisting of materials that support an applicant's contention that its applied-for mark has acquired distinctiveness. Compare, In re EBSCO Industries Inc., 41 USPQ2d 1917 (TTAB 1997), in which the Board found that applicant had demonstrated acquired distinctiveness of the configuration of a fishing lure by submitting, in addition to information about the applicant's use, sales and advertising, 19 non-form declarations by those having an expertise in fishing, and explaining, with particular reasons, that the individual would recognize the origin of the lure by its shape. See also, TBMP § 702.05 (3d ed. 2011) ("Overly Large Records").

As noted, applicant relies heavily on the examination that occurred in the Fred Martin application, Serial No. 76359112, which was for a mark consisting of a yellow background with numbers showing the price of the vehicles in green, used for dealerships in the field of new and used automobiles. Applicant states that the consumer and retailer statements it submitted in the present application were drafted by its counsel based on the declarations that were submitted in connection with the Fred Martin application, and which presumably influenced the examining attorney in approving that application for registration. The papers that were filed in connection with that

application, and the Office actions by the examining attorney, are not of record herein (although the text from the customer and dealer statements were set forth in applicant's request for remand). In any event, each case must be decided on its own merits. What the examining attorney found persuasive in a different application involving a different mark with a different evidentiary record has no bearing on our decision here. See In re Nett Designs Inc., 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001). That is particularly true in a case involving acquired distinctiveness, since the amount and type of evidence that will be persuasive for a finding of acquired distinctiveness is highly dependent on the mark and goods involved and the specific evidence submitted.

Applicant has also submitted, in support of its claim of acquired distinctiveness, an article discussing how college sports teams use particular colors to identify their teams. Certainly if there is a practice in an industry to use color combinations as trademarks for goods or services, consumers would be more likely to view another color combination as a trademark and, as a result, it would be easier to show acquired distinctiveness for a new color combination. Cf. In re Black & Decker Corp., 81 USPQ2d 1841 (TTAB 2006). However, there is no evidence that in

25

the cigarette industry particular color combinations, without regard to the word marks used for the cigarettes, are promoted or recognized as trademarks. Accordingly, the fact that color combinations function as marks for college sports teams has no effect on our determination herein.

Finally, applicant has submitted evidence to show that applicant's orange and green "mark" has been copied, from which applicant asserts that the color combination is recognized as applicant's mark.

The first item we consider is a posting on Engrish.com from November 27, 2007 of a cap with the words "Truck smell the pleasure." The word "Truck" is shown in orange, and there is a boomerang design similar to the one used on applicant's cigarette boxes, in green. The crown of the hat, on which all this material appears, is light blue, and the brim is yellow. The font for the words is the same as the font in which "Newport" and many of the other words and slogans are depicted in applicant's advertisements and promotional material. Applicant asserts that this evidence shows that "the orange and green color combination is even known in Japan to be connected with applicant." p. 20. Even if we were to accept that this is a parody of the proposed mark, any recognition of the color combination in Japan would have no bearing on whether the matter is

26

recognized as a mark in the United States.  We cannot assume that if the matter is recognized in Japan as a mark, it must be recognized as such in the United States as well. Further, even if we were to assume that this advertisement is circulated in the United States, we cannot draw the conclusion that it shows a recognition that the matter sought to be recognized is a mark.  As noted, the cap shows the boomerang design that appears on the packaging for applicant's cigarettes, it includes the word "pleasure," which is used in the vast majority of the ads that applicant has submitted herein as representative of its advertising, and the words are in the same font that is associated with applicant's display of "Newport" and other text in advertisements, promotions and point-of-sale displays in the United States.  The additional elements may play a role in the asserted parody in terms of pointing to applicant, and therefore we cannot conclude that the separate use of truck in orange and the boomerang design in green is a recognition that any text in orange on a green background is recognized as applicant's mark.

Applicant has also submitted an advertisement from the August/September 2006 issue of "Dub" magazine, described on the cover as "the original automotive lifestyles magazine." The ad is for sneakers called "Ari 'Menthol 10s,'" and

27

contains two photos.  One is a picture of a man at a picnic putting ketchup on a sneaker, and features a box that looks like a supersized cigarette box which bears the words "Menthol 10s" and also has a boomerang design on it.  A green border surrounds the photo, and on the green border above the photo are the words "Indulge Yourself!" while below the photo are the words "After all, if you're not gonna binge, why bother?"  The text is in white, but it uses a font like that in applicant's ads.  The second photo is of a green sneaker with a similar boomerang design and its mate with the sole, which is orange, facing the viewer, next to a supersized cigarette box with the words "Menthol 10s" on the top and "ARI" and the boomerang design on the front.  The text says:

> What is up with these sneakers that come in a cigarette box?  More than anything, the unique sneakers are satirical celebrations of an old Newport marketing campaign that became iconic. Although designer Ari the Sneaker Geek claims he doesn't drink or smoke, he designed the "Menthol 10s" to commemorate a time when his career was virtually "Alive Under Pressure."  The ARI Menthol 10s created such a stir that at least 30-40 people were camped out at 5 p.m. outside ALIFE for a 10 a.m. release the next day.

Applicant also submitted a web article about these sneakers, "KATC FEATURE: 'Keeping it on the Go' with ARI and his Beautifully Complex 'Menthol 10s'," consisting of an interview with ARI.  He states that "if you are from the

28

hood, like we are, you can appreciate Newport," and explains the origin of the sneakers as relating to a magazine he published called "On the Go" in which the cover looked like a Newport ad, with "the classic orange, green and white," and "how the Newport ads look kind of like Mentos ads" with "De La Soul [music group] all looking cheesy in the picture, like the people in the Newport ads." The sneaker was a celebration of the impact on New York of that cover.

It is clear from the sneaker ad itself, as well as the interview, that the sneaker and ad is a parody of or reference to Newport cigarettes and its advertising, although ARI recognized that "I think that most kids will look at it as a cool colorway" [color combination] rather than a reference to Newport cigarettes.  Comments made by readers at the end of the article also reference the cigarette brand ("hey i am a big fan of Newport my dad works for them i really want a pair of these shoes," iowasmostwanted; "every fam bam i noe would want these i have to have them newprts r in my blood man i need em faaast," Mario), although several of the comments also view the sneakers as being a reference to Nike ("Wack.  An upsidedown Nike logo on an AFI sneaker." Bob; "The design is SICK!  It Shows how Nike's and Newports are and will

29

ALWAYS be in this city." Steve). Although the ad and the sneakers, with their cigarette box packaging, are designed to reference Newport cigarettes, and that viewers, for the most part, understand that reference, they do not necessarily show that *any* orange-colored text on a green background used in connection with cigarettes creates that reference. The "DUB" magazine ad also uses the same type of photograph that is used in Newport ads, a photograph that ARI indicates Newport ads are known for. And the ad also features the same type font that is used in the majority of Newport ads and displays.

Finally, applicant has submitted an advertisement for Bailey's cigarettes in which the letters N-E-W and part of P, in orange, in the type font in which the Newport trademark is normally depicted, appears on a green background, with the rest of the word covered by a tobacco leaf, giving the impression that Bailey's cigarettes are taking the place of Newport cigarettes. We agree that this ad presupposes that viewers will understand that Newport cigarettes are being referenced.

Although the evidence, taken in its entirety, shows that there is some consumer recognition that applicant uses the colors orange and green for its cigarettes, we cannot say that the evidence demonstrates that consumers will

recognize any orange-colored text appearing on a green background as a trademark of applicant's. The uses of the orange and green colors also include a particular type font for the text, and this type font also forms part of the commercial impression. Thus, based on the evidence submitted by applicant, we find that applicant has not demonstrated that the orange and green color combination for which it has applied, namely, any orange text appearing on a green background, has acquired distinctiveness as a mark.

In view thereof, the refusal of registration on the ground that the applied-for matter does not function as a mark is affirmed. Further, because the applied-for matter does not make a separate commercial impression from the wording shown in the specimens, the drawing is also unacceptable because it is a mutilation of the mark, and the refusal on that basis is affirmed as well.